C.N., individually and as Guardian Ad Litem of J.N., a minor; L.M., individually and as Guardian Ad Litem of V.M., a minor and M.E., individually and as Guardian Ad Litem of J.E., a minor; Plaintiffs,

v.

RIDGEWOOD BOARD OF EDUCATION, Frederick J. Stokley, Joyce Snider, Ronald Verdicchio, Robert Weakley, John Mucciolo, Anthony Bencivenga, and Sheila Brogan, Defendants.

Civil Action No. 00–1072 (JLL).

United States District Court,
D. New Jersey.

June 3, 2004.

F. Michael Daily, Jr., Esq., F. Michael Daily, Jr., LLC, Westmont, NJ, for Plaintiffs.

David B. Rubin, Esq., David B. Rubin, P.C., Metuchen, NJ, for Defendants.

## AMENDED OPINION & ORDER

LINARES, United States District Judge.

Plaintiffs, three parents who are acting on behalf of three minor students enrolled in the Ridgewood Public School System, brought this action seeking relief for alleged constitutional and statutory violations arising from the administration of a student survey in the Ridgewood schools. Defendants are the Ridgewood Board of Education and several school administrators, including Frederick J. Stokley (Superintendent of Schools), Joyce Snider (Assistant Superintendent), Ronald Verdicchio (Executive Director of Ridgewood Community School), Robert Weakley (Director of Human Resources), John Mucciolo (Ridgewood High School Principal), Anthony Bencivenga (Benjamin Franklin Middle School Principal), and Sheila Brogan (Board of Education President) (collectively, the "Defendants"). Presently before the Court is the motion for summary judgment by Defendants pursuant to Fed.R.Civ.P. 56. The Court heard oral arguments on this motion on March 8, 2004. For the reasons set forth herein,

Defendants' motion for summary judgment is granted in full.

## BACKGROUND

In 1998, the Human Resources Coordinating Council ("HRCC") of the Village of Ridgewood, an organization comprised of public and private social service agencies, assembled a group of community members to assess the needs of local youth. The group concluded that it was important to survey Ridgewood's student population to better understand their needs, attitudes and behavior patterns in order to use the town's programs and resources more effectively. Throughout 1999, representatives of the group met with public bodies and citizen groups to publicize the survey and elicit public comments. The HRCC formed a "Vision Team" to oversee the project, comprised of thirty representatives from various sectors of the community, including a student from Ridgewood High School.

In May 1999, Defendant Frederick Stokley, the Superintendent of Schools, notified all parents that the survey was to be administered in the fall, and explained the reasons for the survey. Around the same time, members of the Federated Home and School Association (the "Association"), a group composed of the presidents of the nine Ridgewood parent-teacher associations, held several meetings in which the student survey was discussed. Defendants Stokley and Brogan, as representatives of the school administration, attended these meetings. In June 1999, Defendant Verdicchio presented an overview of the survey to the Association and told its members that the individual parents' rights to refuse the administration of the survey to their children would be respected. (Pl.Appx., 109–10). Although denied by Defendants, Plaintiff C.N. claims that Defendants Stokley and Brogan promised that a written consent form would be required. (Pl. Aff., Ex. E; Dep. of C.N., 31) (Def. Resp. to Pl.'s St. of Material Facts, 2). On June 28, 1999, after a meeting of the Association, Brogan sent an email to Verdicchio stating that the "process of allowing children to opt out of participating in the survey must be part of the parental information." (Pl. Aff., Ex. I). The Association eventually passed a motion to support the administration of the survey. (Pl.Appx., 112).

On September 1, 1999, Defendant Stokley sent another letter to the parents, in which he reiterated the purpose of the survey, and disclosed that "some survey items seek information about at-risk behaviors such as substance abuse, sexuality, stress and depression." He emphasized that the survey would be "voluntary and anonymous." (Pl.Appx., 128). Stokley also stated that a copy of the survey would be available for parental review in the main offices of both the middle schools and high schools. According to Stokley's deposition, approximately 15–20 parents came to review the survey following the letter. (Def.S.J.Mot., 16, n. 7).

On October 4, 1999, Defendant Ronald Verdicchio, sent a letter to the principals of the administering schools, in which he included draft directions to their staff for the administration of the survey as follows:

> Students should be informed that the survey is anonymous and voluntary. If a student elects not to complete the survey he/she should hand in the blank copy. If a person chooses not to answer a question, he/she should be instructed to leave the item blank. Students who choose not to take the survey should read or work quietly while others are completing the survey.

(Pl.Appx., 181).

Verdicchio's letter told the principals that they should "[p]lease feel free (I know

you will) to edit the directions as you choose." (*Id.*)

As preparation for the survey continued, Defendant Mucciolo, Principal of Ridgewood High School, had numerous discussions with students, parents and teachers at Ridgewood High School, in which he informed them that the survey would be voluntary. (Pl. Aff., Ex. P; Dep. of Mucciolo, 48–49). Defendant Bencivenga, Principal of Benjamin Franklin Middle School, also instructed his staff on several occasions in individual, group and full faculty conferences, that the survey was to be administered anonymously, confidentially and voluntarily. (Pl. Aff., Ex. Q; Dep. of Bencivenga, 69, 79–80). Defendant Brogan reiterated the assertion that the survey was always intended to be voluntary and that there was never any discussion about requiring students to take survey. (Pl. Aff., Ex. L; Dep. of Brogan, 51–52).

The survey was administered to students at the Benjamin Franklin Middle School on October 13, 1999, and to students at the Ridgewood High School on November 2, 1999. The survey, designed by the Search Institute of Minneapolis, Minnesota, consisted of 156 questions encompassing a wide range of topics, including the student's relationship with his or her parents, the student's past criminal activity, alcohol and drug use, and sexual activity. The questions were intended to measure the strength of various attributes and experiences known to promote a healthy adolescence. The survey was designed to be completed anonymously, and the results were only to be presented in the aggregate. There was no space on the survey for a student's name or any way to trace answers to a particular student. The front cover of the survey instructed students that the "answers on this questionnaire will be kept strictly confidential. DO NOT put your name on this form. It has

no code numbers, so no one will be able to find out how you or anyone else answered.... Therefore, no one will be able to connect your answers with your name." (Pl.Appx., 233).

There is some disagreement as to precisely what occurred on the day of the survey. At least one of the students involved in this, V.M., has stated that her teacher told her that she was required to take and place her name on the survey. (Pl. Aff., Ex. S; Dep. of V.M., 102). At deposition, her teacher, James Grasso, admitted that although his recollection of the survey day was not very clear, he may have failed to tell his middle-school students that the survey was not required. (Pl. Aff., Ex. R; Dep. of Grasso, 59, 60, 71). J.E., another student involved in this suit, who took the survey in a different location, admitted that she was told the survey would be anonymous. (Pl. Aff, Ex. W, Dep. of J.E., 71). Her teacher specifically told the class that the survey was voluntary and not to put names on the survey. (Pl. Aff., Ex. U, Dep. of Guantez, 19, 26, 32). J.N., the final student involved in this case, asserts that students were told that they would be "cutting class" if they left the room during the administration of the survey. J.N. does not claim that the survey itself was mandatory. (Pl. Aff., Ex. X, Deposition of J.N., 166).

After the survey was administered, the survey booklets were placed in a closed carton and immediately transported to the school district's administrative offices where they were secured in a locked office and sent to the Search Institute to tabulate the results. Upon tabulation, the Search Institute destroyed the individual test booklets in accordance with its standard record retention practice. The summarized results of the survey were eventually released to the public.

On March 6, 2000, Plaintiffs filed the present action. Plaintiffs claimed that the survey violated their rights under the Family Educational Records Privacy Act, 20 U.S.C. § 1232g (FERPA) and the Protection of Pupil Rights Amendment, 20 U.S.C. § 1232h (PPRA). Plaintiffs also asserted claims pursuant to 42 U.S.C. § 1983 for alleged violations of the United States Constitution, namely, that the administration of the survey compelled speech in violation of the First Amendment; was an unreasonable intrusion into the household in violation of the Fourth and Fourteenth Amendments; violated the Fifth and Fourteenth Amendment substantive due process rights of the adults to raise their children as they saw fit; contravened the right to privacy under the Fourth, Fifth, and Fourteenth Amendments; and violated the Fifth Amendment privilege against self-incrimination.

On February 15, 2001, Judge Nicholas H. Politan, to whom this case was originally assigned, denied Plaintiffs' application for a preliminary injunction and granted Defendants' motion for summary judgment, thereby dismissing the case. *C.N. v. Ridgewood Board of Education,* 146 F.Supp.2d 528 (D.N.J.2001). The court dismissed suit against the Board of Education because the "official policy of the Board was that the survey be administered voluntarily and anonymously" and any contrary actions by employees could not be characterized as the policy of the Board. *Id.* at 533. Moreover, the court found that the individual defendants were entitled to qualified immunity on the statutory and constitutional claims as a review of the case law at the time of their actions would not indicate that they were violating any of Plaintiffs' clearly established constitutional rights. *Id.* at 535. Judge Politan rejected Plaintiffs' First Amendment claim and found that the "compelled disclosure" cases offered by Plaintiffs were inapplica-

ble as nothing was compelled by Defendants as a condition to some benefit. In addition, the court denied Plaintiffs' "unreasonable intrusion" and privacy claims under the Fourth and Fourteenth Amendments because the survey did not comprise an unconstitutional intrusion or privacy violation in light of its voluntary and anonymous nature. The court also rejected Plaintiffs' substantive due process claim concerning the right to direct the upbringing of children because there was "no injection by the defendants into the private realm of the family." *Id.* at 539. Finally, Judge Politan dismissed Plaintiffs' claims under the Fifth and Fourteenth Amendment right to self-incrimination because there was no possibility of incrimination based on the anonymity involved and the fact that the surveys were eventually destroyed. *Id.* at 540.

On December 10, 2001 the United States Court of Appeals for the Third Circuit upheld the dismissal of the Fifth Amendment self-incrimination claim, but reversed the summary judgment decision on the remaining claims and remanded the case. *C.N. v. Ridgewood Board of Education,* 281 F.3d 219 (3d Cir.2001). The Third Circuit emphasized that summary judgment was premature without allowing Plaintiffs' further discovery on their claims. For example, the court stated that without further discovery, it was improper to conclude that it was not the Board's policy to require students to take the survey. *Id.* at 2001 WL 1682774, slip op. at 4. The Third Circuit noted that the record thus far presented a factual dispute as to whether students were required to take the survey, and if a jury could find that students were actually required to take the survey, then the District Court would have to address the question as to whether a teacher or principal would have reasonably understood that the survey was being ad-

ministered in violation of the law. *Id.* at 2001 WL 1682774, slip. op. at 6. Following remand, the parties consented to an order dismissing the PPRA and FERPA claims in light of the Supreme Court's decision in *Gonzaga Univ. v. Doe,* 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).

Discovery is now complete in this case. On this summary judgment motion, the Court must address Plaintiffs' remaining legal claims. The Court must consider: (1) whether Defendants compelled the speech of the students in violation of the First Amendment; (2) whether Defendants' actions constitute an unreasonable intrusion into the household in violation of the Fourth and Fourteenth Amendments; (3) whether Defendants violated the substantive due process rights of parents to raise their children as they see fit; and (4) whether Defendants violated the privacy rights of the students.[1] Upon allowing for discovery pursuant to the Third Circuit's directive, and upon thoroughly reviewing the complete record as well as the contentions of the parties at oral argument, the Court concludes that the Defendants did not violate Plaintiffs' constitutional rights. Accordingly, the Court grants summary judgment to Defendants on all claims. In light of the absence of individual liability, the Court need not decide whether the Board of Education could be held liable for the actions of the individual Defendants.

## LEGAL FRAMEWORK

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted only when the evidence contained in the records shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.,* 96 F.3d 66, 69, n. 2 (3d Cir.1996). In determining whether there remain any actual issues of factual dispute, the court must resolve all reasonable doubts in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Meyer v. Riegel Prods. Corp.,* 720 F.2d 303, 307 n. 2 (3d Cir.1983). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once that burden has been met, it is incumbent upon the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Thus, if the non-movant's evidence on any essential element of the claims asserted is merely "colorable" or is "not significantly probative," the court should enter summary

---

**1.** In keeping with the manner in which Plaintiffs have construed their claims in the briefs, the Court analyzes items (2), (3) and (4) under both varieties of the broader constitutional "right to privacy" with respect to the students and parents, as set forth in *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d

64 (1977). In addition, the Court notes that Plaintiffs have conceded at oral argument that the Fourth Amendment claim relates only to the privacy arguments and to the extent the Fourth Amendment relates to search and seizure, it is not part of the action.

judgment in favor of the moving party. *Anderson,* 477 U.S. at 249–250, 106 S.Ct. 2505. In other words, the non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin,* 96 F.3d at 69 n. 2. Keeping in mind the fact that this matter comes to this Court in this particular procedural posture, the Court will now turn to the issues presented in this case.

### B. § 1983 Background and Immunity

There are certain requirements for establishing a constitutional claim under 42 U.S.C. § 1983. Section 1983 reads, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Section 1983 does not create substantive rights; instead "it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder,* 95 F.3d 1199, 1204 (3d Cir.1996). A Section 1983 action has two essential elements: 1) that the conduct complained of was committed by a person acting under color of state law; and 2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Powell v. Ridge,* 189 F.3d 387, 400 (3d Cir.1999). As the parties do not dispute the first factor, the Court will focus solely on whether Defendants' conduct deprived Plaintiffs of a right that is actionable under Section 1983.

If Plaintiffs have set forth a *prima facie* case for a 1983 violation, the Court must determine which of the Defendants, if any, are entitled to immunity for their actions. The United States Supreme Court has emphasized the importance of resolving immunity questions at the earliest possible stage in litigation because "[t]he entitlement is an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Qualified immunity shields state officials performing discretionary functions from suit for damages in their individual capacity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating qualified immunity claims, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999); *Wilson v. Russo,* 212 F.3d 781 (3d Cir.2000). If a clearly established right has been violated, it must then be considered whether in light of the circumstances known to the officer at the time, a reasonable government official would have known that his conduct violated the right; if a reasonable officer would have so known, then an officer is not entitled to immunity for such actions. *See Harlow,* 457 U.S. at 813–20, 102 S.Ct. 2727; *Bartholomew v. Commonwealth of Pennsylvania,* 221 F.3d 425, 428 (3d Cir.2000); *Nan-*

nay v. Rowan Coll., 101 F.Supp.2d 272 (D.N.J.2000). In determining whether a government official is entitled to immunity, both the existence of a clearly established right and the objective reasonableness of the officer's actions are questions of law for the Court to decide. See Curley v. Klem, 298 F.3d 271, 278 (3d Cir.2002). Moreover, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Defendants are entitled to qualified immunity only if the Court can conclude, based on the undisputed facts in the record, that Defendants reasonably, though perhaps mistakenly, believed that their conduct was lawful in light of the clearly established law and the information known to them at the time of the alleged constitutional violation. Mantz v. Chain, 239 F.Supp.2d 486, 496 (D.N.J.2002).

## LEGAL ANALYSIS

### A. Constitutional Claims

#### 1. First Amendment

Plaintiffs claim that Defendants violated the First Amendment rights of the students by "compelling" them to answer the survey questions. It is well-established that the freedom of speech protected by the First Amendment prohibits the government from compelling a private person's speech. See, e.g., Wooley v. Maynard, 430 U.S. 705, 714, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) ("[N]o official ... can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.") Moreover, the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." Steirer v. Bethlehem Area School Dist., 987 F.2d 989, 993 (3d Cir.1993) (quoting Wooley, 430 U.S. at 714, 97 S.Ct. 1428).

However, even upon construing all facts in a light most favorable to the non-movants, the record does not support Plaintiffs' contention that the students were compelled by Defendants to disclose any information. All of the evidence obtained through discovery indicates that Defendants had fully intended the survey to be voluntary, made considerable efforts to make known the voluntary nature of the survey to the parents and teachers, and took reasonable actions to ensure that the survey was in fact administered in a fashion so that the students would understand it was voluntary. In his letter to parents, Defendant Stokley emphasized that the survey would be "voluntary and anonymous." (Pl.Appx., 128). Defendant Verdicchio gave the school principals draft survey instructions for those faculty administering the survey, which stated that students "should be informed that the survey is anonymous and voluntary" and that students could hand in a blank copy if they chose not to complete the survey.[2]

---

2. One cannot credibly infer some underhanded plot to administer the survey involuntarily from the fact that Verdicchio's letter allowed the principals to "edit" these directions. Rather, the only reasonable inference from this statement is that teachers must be given some practical flexibility to tailor the directions to the students in their class. In addition, one cannot reasonably infer from the fact that Stokley told the students to take the survey "seriously," that they had to answer the questions in a certain way or even answer them at all. (Pl.Appx., 179). Despite Plaintiffs' attempts to paint a contrary picture, there is absolutely no credible evidence that would indicate that Defendants' statements concerning the proper method for administering the survey were only a mere

(Pl.Appx., 181). The principals of both Ridgewood schools implicated in this case, Defendants Mucciolo and Bencivenga, instructed their teaching staff several times that the survey was to be administered voluntarily and anonymously.

This Court's review of the facts in the case at bar, demonstrates that, at best, Plaintiffs can show only that one teacher in one school, James Grasso, did not tell his students that the survey was voluntary. Whether or not Grasso compelled the survey is of no moment as he is not a party to this action. Based on the aforementioned facts, it is clear that to the extent Grasso did require his students to take the survey, such actions were taken in complete violation of the voluntary policy set forth by Defendants. The Court realizes that a finding of compulsion "need not take the form of a direct threat or a gun to the head." *Axson–Flynn v. Johnson,* 356 F.3d 1277, 1290 (10th Cir.2004). However, in this case, there is likewise no evidence of any indirect compulsion of speech by the Defendants, such as some type of disincentive or penalty if the survey was not completed, so as to be actionable under the First Amendment. Plaintiffs' allegations of punishment relate only to the situation where the students "cut class" by not going to the room altogether while the survey was being administered.

■■■ Defendants cannot be held liable for the failure of one teacher to comply with the survey directives, when they did everything reasonably necessary to ensure its voluntary nature. With respect to the Ridgewood Board of Education, a "school board can be held responsible for a constitutional violation of a teacher only if the violation occurred as a result of a policy, custom or practice established or approved by the board." *C.H. v. Oliva,* 226 F.3d

198, 202 (3d Cir.2000). For the reasons already stated, the Board's policy and practice was for student survey responses to be voluntary, anonymous and confidential. Moreover, with respect to the individual defendants, an individual defendant in a civil rights action must have personal involvement in the alleged wrongs, in that the defendant either participated in the constitutional violation or approved of it. *See e.g., Oliva,* 226 F.3d at 201; *Baker v. Monroe Tp.,* 50 F.3d 1186, 1190 (3d Cir. 1995); *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988) (necessary involvement can be shown "through allegations of personal director or of actual knowledge and acquiescence.") The evidence points to neither participation nor approval by Defendants of any unconstitutional actions. To the extent Plaintiffs are asserting a "failure to supervise" claim under § 1983, such a claim must allege a supervisory practice that the defendant failed to employ as well as "both (1) contemporaneous knowledge of the offending incident or knowledge of prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval." *Bonenberger v. Plymouth Tp.,* 132 F.3d 20, 25 (3d Cir.1997). There is no indication whatsoever in this case that Defendants had contemporaneous knowledge of the offending incident. Similarly, the Court finds no credible evidence from which one could construe any tacit approval of the compulsion of the survey.

Overall, in a compelled speech claim, when a plaintiff fails to prove any compulsion on the part of defendants, the action cannot stand. *See, e.g., Bauchman v. West High School,* 132 F.3d 542, 558 (10th Cir. 1997) (stating that plaintiff failed to meet the "threshold element" of compelled speech claim of "coercion or compulsion").

"wink and a nod" and that their true motives were to force this survey upon the students.

As the evidence in this case completely belies Plaintiffs' assertion that Defendants compelled student speech, the First Amendment argument must fail. Because no reasonable trier of fact could find otherwise, the Court grants Defendants' motion for summary judgment on this claim.[3]

The Court notes that even if Defendants had compelled the students to take the anonymous survey, it is unlikely that the First Amendment claim would go forward. This case does not fit squarely into the line of case law with respect to compelled speech. Simply put, requiring the students to take this survey does not "force individuals affirmatively to acknowledge a message with which they disagree," *Coleman v. Miller*, 117 F.3d 527, 531 (11th Cir.1997) (citing *Barnette*, 319 U.S. 624, 640, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)), and does not require a student to adhere to an "ideological point of view he finds unacceptable." *Wooley*, 430 U.S. at 711, 97 S.Ct. 1428. *See also United States v. Sindel*, 53 F.3d 874, 878 (8th Cir.1995) ("A First Amendment protection against compelled speech ... has been found only in the context of governmental compulsion to disseminate a particular political or ideological message"); *Steirer*, 987 F.2d at 994 (the "constitutional line is crossed when, instead of merely teaching, the educators demand that students express agreement with the educators' values."); *Forum for Academic and Institutional Rights, Inc. v. Rumsfeld*, 291 F.Supp.2d 269, 309 (D.N.J. 2003) (stating that a law which requires military recruiters on law school's campus "does not compel law schools to say anything ... [and] is far different from en-

dorsing the military's policy toward sexual orientation.")

The Ridgewood students were not required to submit a specific answer to any given question so as to espouse a particular point of view, and were free to put any answer or no answer at all, without any adverse repercussions. Even putting aside the significance that the information collected was anonymous and used only on an aggregate basis, there is no particular message that one would associate with the fact that a person was taking the survey. As no reasonable trier of fact could find for Plaintiffs on this First Amendment claim, summary judgment is granted to Defendants.

## 2. Right to Privacy

■ The constitutional right to privacy, as recognized by the United States Supreme Court, extends to two types of interests. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Whalen v. Roe*, 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). The latter decisions have "encompassed matters relating to marriage, procreation, contraception, family relationships, and child rearing and education." *United States v. Westinghouse Electric Corp.*, 638 F.2d 570, 577 (3d Cir.1980) (quoting *Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405). As Plaintiffs suggest both of these interests were violated in this case, the Court will address each one separately.

---

**3.** The Court has taken into account the findings by the United States Department of Education that students at the Ridgewood Public Schools had been compelled to take the survey in violation of the PPRA. (Pl.Aff.Ex.FF). Such findings, however, do not displace this Court's duty to independently ascertain

whether the Constitution has been violated by the Defendants specifically. Moreover, it should be noted that the conclusion by this Court as to the voluntary nature of the survey is consistent with the opinion of Judge Politan upon first examining the facts in this case.

### a. Disclosure of Personal Matters

Plaintiffs contend that the divulgence of highly personal information by the students when participating in the survey violated their constitutional right to privacy. The "right not to have intimate facts concerning one's life disclosed without one's consent ... is a venerable one whose constitutional significance we have recognized." *Bartnicki v. Vopper,* 200 F.3d 109, 122 (3d Cir.1999); *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). However, "there is no absolute protection against disclosure. Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest." *Fraternal Order of Police v. City of Philadelphia,* 812 F.2d 105, 110 (3d Cir.1987) (citing *Trade Waste Mgmt. Ass'n, Inc. v. Hughey,* 780 F.2d 221, 234 (3d Cir.1985)).

Applying the privacy framework to the facts of this case is problematic as the survey data was not "disclosed" as that phrase is normally considered under privacy law. Plaintiffs have cited no case, and the Court has found none, where a constitutional right to privacy was deemed violated when the individualized information was not disclosed. The information obtained from the students was obtained anonymously, in confidence, and the individual results were not publicly disseminated. In addition, the individual data was destroyed after its compilation in the aggregate. The Third Circuit recognized the disclosure prerequisite to a privacy violation in *Doe v. Southeastern Pennsylvania Transp. Auth.,* 72 F.3d 1133 (3d Cir.1995). In *Doe,* an employer viewed the private medical records of its employees and discovered that plaintiff employee was taking HIV-related medicine. The Third Circuit noted that "no privacy violation would have taken place had the information ... come in encoded form.... [Plaintiff] would have

no cause of action if all that had been disclosed were that an unknown number of people at [employer] were purchasing [HIV-related medicine]. Therefore, such disclosure ... came only when [plaintiff's] name was revealed with respect to the purchase of drugs." *Id.* at 1138. *See also American Fed'n of Gov't Employees v. Department of Housing and Urban Dev.,* 118 F.3d 786, 793 (D.C.Cir.1997) (stating that "the individual interest in protecting the privacy of the information sought by the government is significantly less important where the information is collected by the government but not disseminated publicly.") For the same reasons, in the present case, the information was not in an identifiable form and does not constitute a disclosure as is necessary for this claim.

Moreover, upon examining the evidence, the Court believes that this information was taken voluntarily. It is difficult to fathom how an invasion of privacy can be found when the information was procured voluntarily from students. In *National Federation of Federal Employees v. Greenberg,* 983 F.2d 286 (D.C.Cir.1993), the court rejected the privacy claim by government employees who were challenging the Department of Defense's use of security clearance questionnaire on a voluntary basis upon stating that "the record casts doubt on whether [plaintiffs] are being forced to reveal the information, and therefore doubt about whether their privacy is being invaded .... nothing detrimental will follow the employee's refusal to cooperate." *Id.* at 294. The court remarked that "questions do not invade privacy, answers do." *Id. See also Rinderer v. Delaware County Children and Youth Servs.,* 703 F.Supp. 358, 362 (E.D.Pa.1987) ("[v]oluntary disclosure amounts to waiver of a privacy claim.") In similar fashion, this Court will not find an actionable privacy violation simply because the questions were asked, when the Defendants did not

force any answers. Although the Third Circuit has not expressly drawn this conclusion, the requirement of involuntariness to this type of privacy invasion claim can be logically inferred from various comments. *See, e.g., Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir.2000) (noting that compelling student to take pregnancy test, along with failure to keep that information confidential could infringe privacy right); *Fraternal Order*, 812 F.2d at 111 (rejecting notion that employees voluntarily chose to disclose information in this case because the information was a prerequisite for continued employment). Again, to the extent any isolated acts of compulsion did occur, Defendants cannot be liable for actions taken by others without their approval and completely contrary to their directives. *See C.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir.2000); *Baker v. Monroe Tp.*, 50 F.3d 1186, 1190 (3d Cir.1995); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

However, even if the Court were to disregard those fundamental aspects of the survey that preclude Plaintiffs' privacy claim, the balancing test applied in these cases points to the same outcome. In *United States v. Westinghouse Electric Corp.*, 638 F.2d 570 (3d Cir.1980), the Third Circuit set forth various factors useful to courts when considering whether a given disclosure constitutes an actionable invasion of privacy. An examination of these factors supplies a judicial "balancing test" in this context in which the societal interest in disclosure is weighed against the privacy interests of the individuals. The *Westinghouse Electric* factors are: (1) the type of record requested; (2) the information it does or might contain; (3) the potential for harm in any subsequent nonconsensual disclosure; (4) the injury from disclosure to the relationship in which the record was generated; (5) the adequacy of safeguards to prevent unauthorized disclosure; (6) the degree of need for access; and (7) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest favoring access. *Westinghouse Electric*, 638 F.2d at 578. The extent of the individual's privacy expectation is embodied in the first five of these factors whereas the governmental interest in disclosure is encompassed in the final two factors. *P.F. v. Mendres*, 21 F.Supp.2d 476, 483 (D.N.J. 1998).

An analysis under *Westinghouse* corroborates the Court's conclusion that this privacy violation cannot stand. The information requested, relating to, among other things, sexuality, sexual activity, drug use and relationships, is of course of intimate and private. *See e.g., Westinghouse Electric*, 638 F.2d at 577 (finding that private medical information is "well within the ambit of materials entitled to privacy protection" partly because it concerns intimate facts of a personal nature). The "more intimate or personal the information, the more justified is, the expectation that it will not be subject to public scrutiny." *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112–113 (3d Cir. 1987). An individual could reasonably expect the type of information requested in the survey would remain private unless otherwise volunteered. Presumably, the personal nature of the information could also lead to a great potential for harm if it were released. However, the "potential for harm must be measured within the context of the disclosure that actually occurred." *Doe*, 72 F.3d at 1141. In this case, as already discussed there was no actual disclosure, at least in such a form that could produce harm in an individual. In fact, at deposition, two of the three students in this suit admitted that the survey produced no deleterious impact on them. (Pl. Aff., Ex. X; Dep. of J.N., 179–

180; Ex. W, Dep. of J.E., 80–81). Moreover, the Court has been presented with no evidence that the relationships between Defendants and the students has changed as a result of this survey.

The Court also believes that the information collected was safeguarded adequately. After the survey booklets were completed, they were placed in a closed carton and transported immediately to the school district's administrative offices, where they were secured in a locked office. From this locked office, they were sent directly to the Search Institute for the tabulation the results. The booklets were not reviewed in any manner by anyone prior to being sent to the Search Institute and have since been destroyed. (Pl. Appx., Stokley Decl., 231–232). This level of security bestowed upon the survey has been deemed sufficient by the courts. *See Westinghouse Electric,* 638 F.2d at 580 (finding adequate safekeeping when the information was stored in locked cabinets and removed after several months and a regulation stated no disclosures would be made); *Walls v. City of Petersburg,* 895 F.2d 188, 194 (4th Cir.1990) (finding safeguards adequate when questionnaire information was kept in locked private filing cabinet with very limited access). The security measures taken certainly cannot be compared with those deemed inadequate in *Fraternal Order* when there was a "complete absence of ... protection of the confidential information." 812 F.2d at 118.

Overall, then, the Court believes that the type of information involved in the survey is generally entitled to privacy protection. However, the important interest in privacy must be considered within the context of the specific facts of this case. The Court believes that the Plaintiffs' privacy interests are not as pronounced when the information was properly secured from

public exposure, and the only retention and dissemination of the information that took place was in a non-identifiable, aggregated form.

Weighed against the privacy interests existing in this case is the strong governmental interest in "disclosure." The Court's conclusion in this regard is influenced by the Third Circuit case of *Fraternal Order of Police v. City of Philadelphia,* 812 F.2d 105 (3d Cir.1987). In *Fraternal Order,* applicants to police officer positions were asked to confidentially supply information regarding their medical background, financial status and behavior in order to determine whether they were capable of working in stressful situations. The Third Circuit found that such disclosures did not unconstitutionally infringe upon the applicant's privacy rights. Although finding that medical information is entitled to protection, the "governmental interest in public health has justified requiring disclosure of information about past medical history, present illness, or the fact of treatment." *Fraternal Order,* 812 F.2d at 113. Because the medical information was "directly related" to the interest of the police department in selecting fit officers, no constitutional infringement was found. *Id.* at 114. In addition, the financial information sought was covered by the right to privacy but the "strong public interest in avoiding corruption among officers" outweighed any privacy expectations. *Id.* at 116. Finally, the Third Circuit found that behavioral information, such as an applicant's private drinking habits and gambling activity are subject to privacy protection, but this interest is subsumed by the city's "legitimate interest in staffing a special police investigatory unit with officers who are able to resist the many temptations that will await them." *Id.* at 116–117.

The Court cannot say that the government's interests are any less important in the present case. To draw such a conclusion would force the Court to improperly inject itself into policy considerations related to the social value of these surveys. Questioning the wisdom of the survey is simply not within the judicial domain. At the same time, it is clear that the government has a legitimate and substantial interest in studying the significant problems that affect today's youth, such as violence, drug use, mental and emotional health. There is also an "articulated public policy" in the pursuit of these goals in the public schools. The New Jersey Department of Education has noted the "[s]erious health problems and violence [that] confront our young people on a daily basis while conflicting messages from the adult world facilitate and encourage high-risk behavior." (Rubin Decl., Ex. A, New Jersey Core Curriculum Content Standards). The Department of Education has found that primary causes for these health problems include drug and alcohol use, tobacco use, and sexual behaviors that lead to sexually transmitted diseases. (*Id.*) As such, public schools in New Jersey are required by the New Jersey Department of Education to teach all students about the effects of alcohol and drug use as well as "the biological, social, cultural, and psychological aspects of human sexuality and family life." (*Id.*)

All in all, the Ridgewood survey was a legitimate attempt to obtain information directly related to the understanding and prevention of these social problems confronting youth.

In fact, the New Jersey Supreme Court has at least implicitly sanctioned this type of survey by upholding random drug and alcohol testing programs in high schools. In *Joye v. Hunterdon Central Regional High School Bd. of Educ.*, the need for the drug testing program was justified by data obtained from the students in a written anonymous questionnaire. 176 N.J. 568, 826 A.2d 624 (2003). Such a questionnaire appears very similar to the survey in the case at bar.

In sum, the application of the *Westinghouse* factors to the specific circumstances of this case substantiates the Court's conclusion that the societal interest in disclosure outweighs any invasion of the students' privacy. Although the survey answers were personal in nature, the Court finds that Defendants attempted to obtain such information in the least intrusive manner possible. A voluntary, anonymous and confidential student survey without individually identifiable results that was administered only after fair notice to parents does not amount to a constitutional privacy violation.[4]

4. The Court agrees with Judge Politan that the facts in this case are clearly distinguishable from those in *Merriken v. Cressman*, 364 F.Supp. 913 (E.D.Pa.1973). In *Merriken*, the court found that plaintiff student's privacy rights were violated after he had been given a questionnaire by a local school district designed to aid in identifying potential drug users. The program in *Merriken* was "initially designed as mandatory and sought to actually identify potential drug users, report the potential drug-using student to the school superintendent, and then subject the student to an intervention." *C.N. v. Ridgewood Bd. of Educ.*, 146 F.Supp.2d at 540 n. 12. In addition, the outcome in *Merriken* hinged upon

the insufficient disclosures to parents of the nature of the questionnaire, which were deemed "selling devices aimed at gaining consent without giving negative information that would make the parents completely aware of the relevant circumstances and likely consequences" of the results. *Id.* at 919. Unlike the complete lack of candor in *Merriken*, the information provided to parents in the present case sufficiently informed them the nature of the questions that would be asked in the survey. Finally, in important contrast to the case at bar, in *Merriken*, no confidentiality safeguards protected the information obtained.

### b. Independence in Making Important Decisions

■ Plaintiffs also argue that Defendants deprived parents of their constitutional right to make important decisions with respect to the care and control of their children by subjecting the children to the allegedly intrusive survey. Parents undoubtedly possess the right to raise their children without undue state inference. *Gruenke v. Seip*, 225 F.3d 290, 303 (3d Cir.2000). Indeed, "the care, custody, and control of their children [is] perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). *See also Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (right of parents to control education of their children); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (right to direct upbringing and education of children). More specifically, "[s]chool-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution." *Gruenke*, 225 F.3d at 307.

The facts of this case do not establish a constitutional violation. Once again, the Court emphasizes the crucial fact that Defendants played no part in any sort of compulsion of the students and that their best efforts were directed to ensuring that parents were the final arbiters as to whether their children took the survey. Defendants sent letters to the parents notifying them of the upcoming voluntary survey and inviting them to review its propriety. The most logical inference to be drawn from this correspondence is that the child would be surveyed if the parent did not respond. In addition to the correspondence, the survey was preceded by months of publicity through Association meetings and discussions in school and the community. Any parent who did not want his or her child to take the survey could have simply told the child not to answer the questions, without any adverse repercussions.

In a slightly different context, parents sued the school district in *Parents United for Better Schools, Inc. v. School Dist. of Philadelphia Bd. of Educ.*, 148 F.3d 260 (3d Cir.1998), arguing that a condom distribution program in high schools unconstitutionally supplanted their authority. The Third Circuit rejected this argument, finding that no parental rights were offended when the participation in a school program was voluntary and adequate notice provisions existed to inform parents that they can have their children opt out of a program. The fact that parents had to affirmatively object to the program, creating an "opt-out" default rule, did not change the constitutional calculation. *Id.* at 275, 277. Similarly, in the case at bar, Defendants have not impinged on Plaintiffs' rights to raise their children in a manner in which they desire through the implementation of a voluntary, anonymous survey made with notice of opt-out possibilities to parents.

This case cannot fairly be compared to those events in *Gruenke* where the court found that a teacher unconstitutionally intruded into a family's right to manage the upbringing of children. In that case, a swim coach pressured a student swimmer to take a pregnancy test without parental involvement or notification. The test was demanded not out any concern over the health of the student or the unborn child but apparently to ascertain whether she could remain on the swim team. Moreover, the swim coach did not keep the results confidential as he had the student's

teammates administer the test and he discussed the test results with his assistant coaches. 225 F.3d at 303. The confidentiality, anonymity and voluntariness in the case at bar easily distinguish it from *Gruenke*.

Overall, the Court finds that Defendants did not violate either of Plaintiffs' two types of protected privacy interests. As the record presents no material issues of fact, the Court grants Defendants' motion for summary judgment on these claims.

## B. *Qualified Immunity*

█ Although the Court need not go any further to resolve this case, for the sake of completeness, it will add this legal coda. Assuming arguendo that any constitutional claims were violated, individual defendants would certainly be entitled to qualified immunity. Plaintiffs have pointed to no case law, let alone clearly-established law, that would have apprised Defendants that their conduct violated the Constitution. Taking into account the "specific·context of the case," *Saucier*, 533 U.S. at 194, 121 S.Ct. 2151, reasonable school officials would not have known that the administration of a voluntary, confidential and anonymous survey to students after providing adequate notice to parents to opt-out was unconstitutional.

## CONCLUSION

For the aforementioned reasons, it is on this 3rd day of June, 2004, hereby:

ORDERED that Defendants' motion for summary judgment is GRANTED on all counts.

This case is CLOSED.