

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-1-2005

# C.N. v. Ridgewood Bd of Ed

Precedential or Non-Precedential: Precedential

Docket No. 04-2849

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"C.N. v. Ridgewood Bd of Ed" (2005). *2005 Decisions.* Paper 29.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/29

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2849

———

C. N., Individually and as
Guardian Ad Litem of J.N., a Minor;
L. M., Individually and as
Guardian Ad Litem of V.M., a Minor;
M. E., Individually and as
Guardian Ad Litem of J.E., a Minor,

Appellants

v.

RIDGEWOOD BOARD OF EDUCATION;
FREDERICK J. STOKLEY; JOYCE SNIDER;
RONALD VERDICCHIO; ROBERT WEAKLEY;
JOHN MUCCIOLO; ANTHONY BENCIVENGA;
SHEILA BROGAN

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 00-cv-01072)
District Judge:  Honorable Jose L. Linares

———

Argued April 1, 2005
Before:  ALITO, SMITH and FISHER, *Circuit Judges*.

(Filed December 1, 2005)

F. Michael Daily, Jr. (Argued)
216 Haddon Avenue
Sentry Office Plaza, Suite 100
Westmont, NJ  08108
    *Attorney for Appellants*

David B. Rubin (Argued)
44 Bridge Street
P.O. Box 4579
Metuchen, NJ  08840
    *Attorney for Appellees*

Andrew L. Schlafly
521 Fifth Avenue, 17th Floor
New York, NY  10175
    *Attorney for Amicus-Appellant,*
    *Eagle Forum Education*
    *& Legal Defense Fund*

Cynthia J. Jahn
New Jersey School Board Association
315 West State Street
P.O. Box 909
Trenton, NJ  08605
    *Attorney for Amicus-Appellee,*
    *New Jersey School Board*
    *Association*

Julie Underwood
National School Boards Association
1680 Duke Street
Alexandria, VA  22314
> *Attorney for Amicus-Appellee,*
> *National School Boards Association*

―――

OPINION OF THE COURT

―――

FISHER, *Circuit Judge*.

In the fall of the 1999 school year, school officials in the Ridgewood public school district in New Jersey administered a survey entitled "Profiles of Student Life:  Attitudes and Behaviors" to students in the 7th through 12th grades.  The survey sought information about students' drug and alcohol use, sexual activity, experience of physical violence, attempts at suicide, personal associations and relationships (including the parental relationship), and views on matters of public interest.  The survey itself was designed to be voluntary and anonymous.  Survey results were designed to be and actually were released only in the aggregate with no identifying information.

Three students and their mothers ("Plaintiffs") brought this action against the Ridgewood Board of Education ("Board") and several individually named school administrators (collectively "School Defendants").  Plaintiffs claimed that the survey had been administered so as to be involuntary and non-anonymous and had thus violated their rights under the Family Educational Records Privacy Act (FERPA), 20 U.S.C. § 1232g, the Protection of Pupil

Rights Amendment (PPRA), 20 U.S.C. § 1232h, and the United States Constitution. Prior to any discovery, the United States District Court for the District of New Jersey denied Plaintiffs' motion to enjoin release of the survey results and granted summary judgment to the School Defendants on the merits of the statutory and constitutional claims. *C.N. v. Ridgewood Bd. of Educ.*, 146 F. Supp. 2d 528 (D.N.J. 2001). On appeal, this Court reversed in part and remanded for further proceedings. 281 F.3d 219 (3d Cir. 2001) (unpublished). Following discovery and voluntary dismissal of the statutory claims, the District Court granted the School Defendants' motion for summary judgment on the remaining constitutional claims. 319 F. Supp. 2d 483 (D.N.J. 2004). We will affirm.

I.

A.     The Parties

Plaintiffs are Carol Nunn, individually and as guardian ad litem of Jennifer Nunn (surveyed as a 15 year old, high school freshman); Mary Epiphan, individually and as guardian ad litem of Jean Epiphan (surveyed as a 17 year old, high school senior) and L.M., individually and as guardian ad litem of V.M. (surveyed as a 12 year old, middle school 7th grader). We will refer to the student Plaintiffs as "Freshman Plaintiff," "Senior Plaintiff" and "Middle School Plaintiff" and to their guardians collectively as "Plaintiff Parents." School Defendants, with all titles identified as of the date the survey was administered, are the Board, Frederick J. Stokley (Superintendent of the Ridgewood Schools), Joyce Snider (Assistant Superintendent of the Ridgewood Schools), Dr. Ronald Verdicchio (Executive Director of the Ridgewood Community School, and

4

"Executive Director of Community Education"),[1] Robert Weakley (Director of Human Resources), John Mucciolo (Principal of the Ridgewood High School), Anthony Bencivenga (Principal of the Benjamin Franklin Middle School), and Sheila Brogan (President of the Board).[2]

B.      The Facts

In this section, we draw extensively on and frequently quote the District Court's concise statement of the facts. *See* 319 F. Supp. 2d at 486-87. However, because we are addressing an appeal from summary judgment, we will also include in this recitation of the facts additional evidence and any inferences from the totality of the evidence that we conclude ultimately support the Plaintiffs as the non-moving party.

---

[1]Defendant Dr. Verdicchio's titles and role merit further explanation. The Ridgewood Community School, of which Dr. Verdicchio was the Executive Director, was part of the Ridgewood school system and offered primarily adult education, child care, and professional development activities. Superintendent Stokley was Dr. Verdicchio's direct supervisor. One of Dr. Verdicchio's duties was to represent the School District at community meetings on behalf of the Superintendent. He was also involved in preparing grant applications for federal funding.

[2]Our review of the record reveals no evidence to connect Defendants Snider or Weakley in any meaningful way to the underlying events.

5

1.    Choosing the survey and alerting the community

In 1998, the Human Resources Coordinating Council ("HRCC") of the Village of Ridgewood, an organization comprised of public and private social service agencies, assembled a group of community members to assess the needs of local youth. The group concluded that it was important to survey Ridgewood's student population to better understand their needs, attitudes and behavior patterns in order to use the town's programs and resources more effectively. To obtain this information, the group selected a survey designed by Search Institute of Minneapolis, Minnesota.[3] Throughout 1999, representatives of the HRCC met with public bodies and citizen groups to publicize the survey and elicit public comments. The HRCC formed a team comprised of thirty representatives from various sectors of the community, including a student from Ridgewood High School (herein "Community Vision Team"), to oversee the project. The record suggests that Superintendent Stokley, Dr. Verdiccho, Board President Brogan and High School Principal Mucciolo served on the Community Vision Team, although their role in that capacity is unclear. Also unclear is exactly how the

---

[3]It is not entirely clear how this particular survey was chosen. Board President Brogan recalled that some HRCC members had attended an outside training session where the concept of "asset building" had been discussed. The concept of "asset building" is said to be the basis for the questions contained in the survey. *See* Brief of School Defendants at 3 ("[t]he survey ... was intended to measure the strength of 40 'assets,' i.e., attributes and experiences known to promote a healthy and wholesome adolescence."). An HRCC member representing the local YMCA subsequently brought information about Search Institute to the HHRC. Both Dr. Verdicchio and Board President Brogan recalled some type of presentation regarding "asset building" later made to the HRCC.

Ridgewood schools became the venue for the survey beyond the obvious fact that youth attend schools. Dr. Verdicchio testified during deposition that "the reason ... was ... because that's where the students are. So it was not a school project. It was a community project where the students responded in a school setting." A. 436 (Dep. Verdicchio). Dr. Verdicchio, who was described by Board President Brogan as the liaison between the Community Vision Team and district officials, recommended to Superintendent Stokley that the youth be surveyed in the schools. No formal vote appears to have been taken by the Board to authorize administration of the survey; yet the Board, as evidenced by purchase orders in the record, eventually purchased the survey from Search Institute with funds provided to the district by the federal government under a program known as "Goals 2000."

In a letter dated May 19, 1999, Superintendent Stokley notified all parents of students in the district that a survey would be administered to students ages 12-19 in the fall of the upcoming 1999-2000 school year. The letter was sent in the wake of the Columbine, Colorado school tragedy that occurred a month before, and in it, Superintendent Stokley ruminated on the violence facing today's youth, listed available district resources, and in the penultimate paragraph, explained:

> One year ago, the Human Resources Coordinating Council of Ridgewood, an organization that represents public and nonprofit agencies serving children and families, developed an initiative to make Ridgewood a more supportive and nurturing community for young people. Last September, seventy representatives from community agencies and organizations, Village government officials, educators, School Board members, and parents came together to begin the

7

process of assessing the needs and interests of our young people. The [HRCC] and a coalition of twenty Ridgewood organizations are making plans to survey our village youth, ages 12-19 in September [1999]. The results of the survey will be reported at a community meeting in December at the Ridgewood Public Library.

A. 642.

Around the same time, members of the Federated Home and School Association, a group composed of the presidents of the nine Ridgewood parent-teacher associations ("PTA"), held several meetings at which the survey was discussed. Superintendent Stokley and Board President Brogan, as representatives of the school administration, attended these meetings. The record shows that after one of those meetings, the President of the PTA advised Dr. Verdicchio by letter dated May 21, 1999 that its members had expressed "[s]everal serious reservations and concerns" about "giving the survey to the students" because "[t]he explicit content regarding drugs usage, sexual activity, alcohol abuse and suicide ... seemed to suggest such activity was within normal adolescent experience."[4] In June 1999, Dr. Verdicchio presented an overview of the survey to the PTA and told its members that the individual parents' rights to refuse the administration of the survey to their children would be respected. Although denied by the School Defendants, Freshman Plaintiff's guardian, Carol Nunn, testified during deposition that Superintendent

---

[4]Also in the record is an e-mail dated May 25, 1999, from Superintendent Stokley to the district's physician (whose opinion on the survey Stokley had earlier solicited), ruminating that he (Stokley) was "frankly ... stunned by the reaction of the parents in this 'post-Columbine' period." A. 457(c).

Stokley and Board President Brogan promised at that meeting that written consent forms would be required. On June 28, 1999, after a meeting of the PTA, Board President Brogan sent an e-mail to Dr. Verdicchio stating that the "process of allowing children to opt out of participating in the survey must be part of the parental information." The PTA eventually passed a motion in support of administering the survey.

Search Institute shipped the surveys to the district in August 1999, along with a manual and cover memorandum requesting that the manual be reviewed and copies be distributed to every person involved in administering the survey. The manual emphasized that the survey required "a standardized administration format" in order to be effective. The manual also provided student instructions to be read verbatim by survey administrators, one of which provided: "[T]he survey is voluntary. This means you do not have to take it and it is not a test that you take for school grades. Second, the survey is filled out anonymously. No one will know which survey booklet is yours .... Please do not put your name on the survey." (emphasis in the original).

On September 1, 1999, Superintendent Stokley sent another letter to parents, which provided in full:

> Dear Parent:
>
> In late September, Village youth will be asked to complete a survey, *Profiles of Student Life, Attitudes and Behaviors*, developed by the Search Institute in Minneapolis, Minnesota. The voluntary and anonymous survey will be made available to

young people in grades 7-12.[5]  The survey is the first phase of a community initiative, Healthy Communities – Healthy Youth.

The questions in the survey ask young people about attitudes and behaviors relating to themselves, their school, and their community.  While many questions ask about community involvement and school, some survey items seek information about at-risk behaviors such as substance abuse, sexuality, stress and depression.  Prior to the administration of the survey, a copy will be available for parental review in the main office at the middle schools and the high school.  The results of the survey will be reported at a Town Meeting on December 1, 1999, at the Ridgewood Public Library.

The information from the survey will be used to identify the strengths and needs required to support youth and families in the Village of Ridgewood.  The survey results will provide information to more effectively identify existing community assets and resources available to assist our youth to grow in a healthy, caring, and responsible way.

---

[5]At some point during the process, a decision was made not to survey the 6th grade students at the middle schools.  *See* A. 519 (Dep. Middle School Principal Bencivenga) ("after conversation, consensus was reached that seventh and eighth grade was the most appropriate ... I don't know exactly who made the final decision"); *see also* A. 476 (Dep. Board President Brogan) (suggesting this decision was likely made after consultation between Superintendent Stokley, Dr. Verdicchio and the building principals).

10

Attached is additional information about the Healthy Communities – Healthy Youth initiative [attached were a list of the 40 developmental assets and notice of a meeting where the assets would be discussed]. Further information can be obtained by contacting [named school representative] at [telephone number] or through e-mail at [e-mail address].

Sincerely,

/s/Frederick J. Stokley
Superintendent of Schools

A. 637 (emphasis in original). This letter was drafted by Dr. Verdicchio but he and Superintendent Stokley decided it should issue directly from the Superintendent. Approximately 15-20 parents came to review the survey in the wake of the letter.

2.      Preparing to administer the survey

On October 4, 1999, Dr. Verdicchio sent a letter to the principals of the buildings in which the survey would be administered,[6] in which he included draft directions for administration of the survey to be provided to staff. This letter told the principals that they should "[p]lease feel free (I know you will) to edit the directions as you choose." The included instructions provided, in pertinent part:

---

[6]The survey was actually administered at three buildings – the Ridgewood High School, the Benjamin Franklin Middle School and the George Washington Middle School – however, this action included no parties specific to the latter.

11

Directions for Teachers: (1) <u>Students should be informed that the survey is anonymous and voluntary</u>. If a student elects not to complete the survey, he/she should hand in the blank copy. If a person chooses to not answer a question, he/she should be instructed to leave the item blank. Students who choose not to take the survey should read or work quietly while others are completing the survey. (2) Please indicate that the purpose of the survey is to assist the Ridgewood Community, of which the schools are part, to better understand the needs of young people in Ridgewood and how their community supports and assists them. Please indicate that their opinions are valued and they will be invited to a community meeting where the summary results will be reported and they will be part of a discussion with community leaders.

A. 636 (emphasis added).

As preparations for the survey continued, High School Principal Mucciolo had numerous discussions with students, parents and teachers at the High School about the upcoming event. Specifically, he met pre-survey with the three "grade administrators" chosen to administer the survey for the purpose of directing them how to instruct the students.[7] Although Mucciolo could not recall the exact instructions he provided, he did recall telling the grade administrators to inform students that the survey was voluntary, and also that "it was important that it was anonymous, and ... that kids underst[a]nd it is not a test, and they didn't have to take it." A. 505

_____

[7]"Grade administrators" as opposed to teachers were apparently used in an effort to promote anonymity and uniformity in instruction.

12

(Dep. Mucciolo). One grade administrator recalled a meeting where it was discussed how best to get the students to take the survey seriously. It was apparently decided to give the survey in the gymnasium according to when a student had either physical education or health class (i.e., mandatory classes which would ensure that all students took the survey). This grade administrator did not recall being specifically told not to examine the completed surveys, but assumed that was the case. Another individual who was an instructional aide at the High School submitted a declaration relaying how, prior to administration, she had asked a health teacher if students had to take the survey and was told that they did. A few days before administration, a memorandum from High School Principal Mucciolo was distributed to health, physical education and driver education teachers, instructing, *inter alia*: "If students ask what this survey is about, you should say 'This survey offers you an opportunity to express your views about your experience in the Ridgewood Community – especially your experiences in non-school activities.'" A. 563.

Middle School Principal Bencivenga instructed his staff regarding the survey on several occasions in individual, group and faculty conferences. Specifically, he testified during deposition that he met with staff at a faculty meeting and told them the survey would be administered anonymously, confidentially and voluntarily. He also had meetings with the homeroom teachers who were to administer the survey, as well as individual conversations with them prior to administration; he testified in that regard:

> A:  I just made it clear to them when they received the survey, when they were to administer it, it was to be anonymous, confidential and voluntary ... I had individual conferences, small group conferences and a faculty

13

meeting. ... I spoke with every teacher that administered the [survey].

...

Q: [W]hat did you specifically tell each teacher?

A: That the survey was to be administered anonymously, confidentially and voluntarily.

...

Q: Did you say to the teachers that they were to tell the students that it was voluntary?

A: I don't recall if I used those words exactly, but it was clear from my point of view that they were to administer it voluntarily. Whatever word I used, I don't recall, but it was clear that my direction was that this was to be a voluntary survey.

A. 521-22 (Dep. Bencivenga). Mr. Grasso, one of numerous teachers who administered the survey at the Middle School, recalled a meeting with Principal Bencivenga sometime before survey day where homeroom teachers were told to pick up the surveys on the morning of survey day at the main office, and to distribute, collect and return them to the main office that same day. He recalled no instructions as to how specifically to administer the survey. Board President Brogan also reiterated the assertion that the survey was always intended to be voluntary and testified that there was never any discussion about requiring students to take it.

14

### 3. Administering the survey

The survey was administered to students at the Benjamin Franklin Middle School on October 13, 1999, and to students at the Ridgewood High School on November 2, 1999. There is some disagreement as to what precisely occurred during administration at both buildings. Middle School Plaintiff testified that her homeroom teacher, Mr. Grasso, told students they were required to take the survey and to place their names on the survey booklets. She also testified that the booklets themselves had attached to them a sticker asking for name, grade and student identification number and that she put her name on the booklet. Mr. Grasso admitted at deposition that although his recollection of the day's events was not clear, he may have failed to tell his students that the survey was not required. He also could not rule out the possibility that the survey booklets had the stickers (routinely used for standardized testing) attached to them, although he explained why he believed they did not. Middle School Plaintiff also testified that Mr. Grasso collected the completed surveys in her homeroom and placed them in a box, and that she did not observe him examine any of the completed booklets.

Senior Plaintiff who took the survey at the High School said students were told that the survey was anonymous and that her teacher in particular told the class the survey was voluntary and not to put names on it. However, both Senior Plaintiff and Freshman Plaintiff recounted that they heard a loudspeaker announcement which they interpreted to warn that students would receive a "cut" if they did not participate in the survey. A. 577 (Dep. Freshman Plaintiff) (recounting that after students were seated in the gym in preparation for administration of the survey, she heard a loudspeaker announcement that she interpreted as "if you are not there, if you leave, then it is counted as a cut."); A. 567 (Dep. Senior Plaintiff) ("Q: Tell me all the exact words that you remember being used in the

15

announcement. A: ... It said if the students don't go to the survey, they will receive a cut. That's exactly what I remember ...."). The record suggests the following instructions were read at the High School:

> Today, during this period, you have an opportunity to express your views about your experiences in the Ridgewood Community – especially your experiences in non-school activities. Interested in the results of this survey are community members like the Mayor and others in charge of youth activities in the community who will respond to your views in a concrete way. Since the adults in this community are asking for your input, and will take it seriously, you also should take this opportunity seriously to tell adults what you think about a young person's experience in the Ridgewood Community. You should know that this survey is confidential. That means no one will be able to identify who completed individual surveys. This survey should take 45 minutes to complete. Please take advantage of the full amount of time, since we will be using the entire period for this purpose. Please make no identifying marks on your survey. Please begin.

A. 610.[8] High School Principal Mucciolo was present during actual administration of the survey.

---

[8]Although no witnesses could recall the exact instructions, these written instructions were found during discovery in a file pertaining to the survey kept by Dr. Verdicchio.

4.	The survey

The survey itself is obviously critically important to resolution of this appeal.[9] It contained 156 questions with fill-in-the-circle style answer choices. The front cover of the survey instructed: "[A]nswers on this questionnaire will be kept strictly confidential. DO NOT put your name on this form. It has no code numbers, so no one will be able to find out how you or anyone else answered. Your school will receive a report that combines many students' answers together. Therefore, no one will be able to connect your answers with your name." The survey itself did not seek any explicit identifying information (such as name, address or student identification number); however, numerous questions did seek statistical information, including age, grade, sex, racial group and parental family composition. In addition, students were asked to identify their parents' level of education, how long they had lived in their present city and whether they lived on a farm, in the country not on a farm, on an American Indian reservation, or in cities or towns of various specified populations.

Sections of the survey were devoted to drug and alcohol usage. For example, Questions 81, 82 and 83 asked students how many times they had alcohol to drink in their lifetime, during the last

---

[9]While the parties differ in their characterization of the survey and its effect on students who participated in it, the contents of the survey are undisputed. To put this litigation in a broader perspective, we note the existence of a long-lived public debate over whether public schools should be the situs of social research. *See, e.g.*, Beth Garrison, Note,*"Children Are Not Second Class Citizens": Can Parents Stop Public Schools from Treating Their Children Like Guinea Pigs?*, 39 VAL. U. L. REV. 147 (2004) (reviewing history of social research in the public schools).

12 months and during the last 30 days, with answer choices 0, 1, 2, 3-5, 6-9, 10-19, 20-39 and 40+. Questions 94 through 96 asked how many times during the last 12 months students had "been to a party where other kids your age were drinking," "driven a car after you had been drinking" and "ridden in a car whose driver had been drinking," with answer choices "never, once, twice, 3-4 times, and 5 or more times." Questions 92-93 asked "how many times, if any," the student "had used cocaine (crack, coke, snow, rock)" in the student's lifetime and during the last 12 months, with answer choices 0, 1, 2, 3-5, 6-9, 10-19, 20-39, and 40+. Questions 97-98 asked "how many times, if any, have you sniffed glue, breathed the contents of aerosol spray cans or inhaled other fumes in order to get high" in "the last 12 months" and "during the last 30 days," with answer choices 0, 1, 2, 3-5, 6-9, 10-19, 20-39, and 40+. Questions 104-109 asked how many times in the last 12 months a student had used "chewing tobacco or snuff," "heroin (smack, horse, skag) or other narcotics like opium or morphine," "Alawan," "PCP or Angel Dust," "LSD ('acid')," or "Amphetamines (for example, uppers, ups, speed, bennies, dexies) without a prescription from a doctor," with answer choices 0, 1, 2, 3-5, 6-9, 10-19, 20-39, and 40+.[10]

The survey contained questions related to sex, including "have you ever had sexual intercourse ('gone all the way,' 'made love')," with answer choices "no, once, twice, 3 times, and 4 or more times," and "when you have sex, how often do you and/or your partner use a birth control method such as birth control pills, a condom (rubber), foam, diaphragm, or IUD," with answer choices "never, seldom, sometimes, often, and always." The survey contained questions about

_____

[10]Alawan was a fictitious drug. In tabulating survey results, and in an effort to ensure the quality of data reported, Search Institute would remove from the pool any surveys in which the respondent claimed use of this drug.

18

suicide and seemingly related questions about a students' sense of individual worth. For example, Question 101 asked "have you ever tried to kill yourself," with answer choices "no, yes, once, yes, twice and yes, more than two times," and students were asked to indicate their agreement/disagreement on a scale with statements including "on a whole, I like myself," "at times, I think I am no good at all," "I feel I do not have much to be proud of" and "sometimes I feel like my life has no purpose." There were also questions about students' experience of violence in their neighborhood, schools and home. For example, students were asked how many times during the last 12 months they had "taken part in a fight where a group of your friends fought another group," "hurt someone badly enough to need bandages or a doctor," and "used a knife, gun or other weapon to get something from a person," with answer choices "never, once, twice, 3-4 times, and 5 or more times." Students were also asked how often they feel afraid of "walking around your neighborhood," "getting hurt by someone at your school ... [or] at your home," with answer choices "never, once in a while, sometimes, often, and always." Question 149 asked "have you ever been physically harmed (that is, where someone caused you to have a scar, black and blue marks, welts, bleeding, or a broken bone) by someone in your family or someone living with you?," with answer choices "never, once, 2-3 times, 4-10 times, and more than 10 times."

Numerous questions interspersed throughout the survey inquired into the parental relationship. For example, students were asked how often their parents helped with school work, talked to them about school work or attended school events or meetings. Students were also asked to indicate their agreement or disagreement on a scale with such statements as "my parents push me to be the best I can be," "if I break one of my parents' rules, I usually get punished," "my parents give me help and support when I need it," "my parents often tell me they love me," and "I have lots of good conversations

19

with my parents." Question 85 asked "if you came home from a party and your parents found out that you had been drinking, how upset do you think they would be?" Question 99 asked, "in an average week, how many times do all of the people in your family who live with you eat dinner together?" Question 121 asked, "if you had an important concern about drugs, alcohol, sex, or some other serious issue, would you talk to your parent(s) about it?" Question 122 asked "how much of the time do your parents ask you where you are going or with whom you will be?" Question 148 asked how much time a student spent at home without adult supervision.

Finally, there were questions related to students' associations and views on topics of public interest. For example, students were asked how many hours in an average week they spent playing on school or community sports teams, participating in clubs or organizations (other than sports) at school or outside school, attending "programs, groups or services at a church, synagogue, mosque, or other religious or spiritual place," doing organized volunteer service, helping friends and neighbors, and practicing/taking lessons in music, art, drama or dance. The survey also asked students to rate how important certain concepts were in their lives, on a scale of not important to extremely important, including "helping to reduce hunger and poverty in the world," "helping to make sure that all people are treated fairly," "getting to know people who are of a different race than I am," "speaking up for equality (everyone should have the same rights and opportunities)," and "giving time or money to make life better for other people."[11]

---

[11]As the Eagle Forum Education and Legal Defense Fund, as *amicus curiae* in support of Plaintiffs, explains, some view questions like many appearing on the Ridgewood survey as objectionable because the answer choices provided "plant an unfortunate seed in the mind of the recipient." Eagle Forum Amicus Br. at 3. For example,

5.      Security and tabulating the survey

At the High School, completed surveys were placed in a large box either by the students themselves, the grade administrators or Principal Mucciolo. Principal Mucciolo then took custody of the box, delivered it to the guidance office, and had it wrapped and sent immediately to Dr. Verdicchio. Principal Mucciolo believed the grade administrators knew not to look, and indeed did not look, at any of the completed surveys. At the Middle School, although Principal Bencivenga issued no specific instructions to homeroom teachers concerning collection of completed surveys, he assumed that those teachers retrieved them and brought them to his office, where his secretaries collected and forwarded them to the main district office. Superintendent Stokley declared that survey booklets were transported to the main office by courier, where they were secured in a locked office until sent to Search Institute in early December 1999 for tabulation. He further declared that the survey booklets "were not reviewed in any manner." A. 648 (Decl. Stokley).

Dr. Marc Mannes, the director of applied research for Search Institute, explained the process of tabulation. First, a Search Institute staff person would check the number of returned surveys against the number said to have been administered. Then the surveys would be sent to Data Recognition Corporation (under subcontract with Search Institute), which would visually scan the surveys, collect the information on a disk and return the disk and surveys to Search Institute. Search Institute would then format a report of results and send it to the client. It was Search Institute's operating policy to

where the question asks "have you ever tried to kill yourself," the answer choices of "no; yes, once; yes, twice; and yes, more than two times" might be read to suggest that suicidal inclinations are common and accepted.

21

destroy completed surveys within 90 days of their being scanned. The Ridgewood surveys were destroyed in March 2000.[12]

### C.      Prior Court Proceedings

On March 6, 2000 (after administration of the survey, but before results were released), Plaintiffs filed this action, claiming that the survey had been administered so as to be involuntary and non-anonymous, and had thus violated (1) their statutory rights under the FERPA and the PPRA,[13] and (2) their federal constitutional rights,

---

[12]The record does not contain the results of the Ridgewood survey, but does include an "Executive Summary" prepared by Search Institute of results from two other suburban high schools outside New Jersey whose students took the same survey in approximately the same time period. The first page of those results contains a table identifying the number of youth surveyed and the percentage of the total represented by that number, broken down by gender, grade (6th through 12th) and race/ethnicity (specifically "American Indian, Asian/Pacific Islander, Black/African American/Hispanic, White, Multi-racial"). The first page explains that surveys found by Search Institute not to meet any one of five criteria are discarded (results from these two districts indicated that 69 and 138 surveys were discarded on that basis). Pages 2-7 contain tables, bar graphs and pie charts tied to the number or percentage of students exhibiting the "external" or "internal" assets said to be measured by the survey. We see no way for individual students to be identified or connected with their personal information via this format.

[13]The PPRA currently provides, in pertinent part:

[n]o student *shall be required*, as part of any applicable program, to submit to a survey, analysis or

22

including (a) Plaintiff Students' right under the First Amendment against compelled speech; (b) Plaintiffs' right under the Fourth and Fourteenth Amendments to be free from unlawful intrusion into the

> evaluation that reveals information concerning (1) political affiliations or beliefs of the student or the student's parent; (2) mental or psychological problems of the student or the student's family; (3) sex behavior or attitudes; (4) illegal, anti-social, self-incriminating and demeaning behavior; (5) critical appraisals of other individuals with whom respondents have close family relationships; (6) legally recognized privileged or analogous relationships, such as those of lawyers, physicians, and ministers; (7) religious practices, affiliations, or beliefs of the student or beliefs of the student's parents; or (8) income (other than that required by law to determine eligibility for participation in a program of for receiving financial assistance under such program), without the prior consent of the student ... *or in the case of an un-emancipated minor, without the prior written consent of the parent*.

20 U.S.C. § 1232h(b) (emphasis added). The federal statutory claims have since been dismissed by consent of the parties in light of *Gonzaga University v. Doe*, 536 U.S. 273 (2002) (holding that no private right of action exists under the FERPA). While *Gonzaga* addressed only the FERPA, the parties have obviously interpreted it to dictate the fate of the private PPRA claim asserted here. The propriety of that assumption is not before us. We will omit any discussion of those portions of prior opinions in this case which address the statutory claims, and concentrate solely on the constitutional claims dealt with in the order on appeal.

23

household; (c) Plaintiff Parents' substantive due process right under the Fourth and Fourteenth Amendments to raise their children as they see fit; (d) Plaintiffs' right under the Fourth and Fourteenth Amendments to privacy; and (e) Plaintiff Students' right under the Fifth Amendment not to be forced to incriminate themselves (i.e., because some of the survey questions dealt with conduct constituting a crime).[14] Plaintiffs sought to enjoin the then-forthcoming disclosure of survey results and requested damages for emotional harm. The School Defendants filed a motion for summary judgment.

Before any discovery was conducted, the District Court (Politan, J.) denied the injunction request and granted summary judgment to the School Defendants. 146 F. Supp. 2d 528. In an accompanying opinion, the District Court first held that no cause of action for constitutional violations lay against the Board under 42 U.S.C. § 1983 because "the official policy of the Board was that the survey be administered voluntarily and anonymously." *Id.* at 533. Further, the District Court held that even assuming individual school employees had administered the survey so as to make it involuntary, "their actions cannot be characterized as carrying out the policy of the Board." *Id.* The District Court also held that the individual School Defendants were entitled to qualified immunity on the constitutional claims, reasoning: "[t]here is no indication now or in October of 1999 that a *voluntary* and *anonymous* survey which is used to obtain data in the aggregate (rather than personal information on particular individuals) would violate plaintiffs' First Amendment rights to refrain from speaking; their Fourth Amendment rights regarding intrusion into a person's household; the Fifth and Fourteenth

---

[14]Seven complaints about the survey administered at Ridgewood were also filed in approximately the same time period with the United States Department of Education under the PPRA. *See* 20 U.S.C. § 1232h(e). *See infra* n.16.

24

Amendment rights of parents to raise their children; their Fourth, Fifth, and Fourteenth Amendment rights to privacy; or their Fifth Amendment rights against self-incrimination." *Id.* at 535 (emphasis added).[15]

---

[15]Specifically, the District Court rejected the Fifth Amendment self-incrimination claim because the survey results were to be destroyed, and because the District Court found the survey to have been administered anonymously, thus making the identification of any student admitting to a crime in the context of the survey improbable. 146 F. Supp. 2d at 540. The First Amendment compelled speech claim was rejected because "the Board [ ] compelled nothing," *id.* at 538, and because "[n]o adverse repercussions would occur if a student decided not to answer the survey." *Id.* Claims based on the Fourth, Fifth and Fourteenth Amendments for "unreasonable intrusion into the household" and violation of the "right to privacy" were rejected because the District Court interpreted the record to show only that the survey was voluntary and anonymous. *See id.* at 539. Finally, the substantive due process claim of Plaintiff Parents to raise their children as they see fit was rejected on the grounds that School Defendants' conduct "did not rise to the level of a constitutional violation" and did not actually infringe the right. *Id.* at 539. The latter type of claim, reasoned the District Court, only arises where the state has attempted to "eliminate a parent's role in the custody or nurture of the child," *id.*, and such did not happen here because the students' "parents were provided ample notice of the administration of the survey," and were "informed that the survey was voluntary and anonymous." *Id.* at 539-40. Thus, "[School Defendants] have in no way impinged on the plaintiffs' rights to raise their children in a manner which they choose." *Id.* at 540.

25

Plaintiffs appealed and this Court affirmed in part, reversed in part, and remanded. 281 F.3d 219 (3d Cir. December 10, 2001) (unpublished). Specifically, this Court affirmed the dismissal of the Fifth Amendment self-incrimination claim, but concluded that voluntariness was disputed, and thus it was inappropriate for the District Court to dismiss the remaining constitutional claims for reasons tied to voluntariness. As this Court reasoned, one did not know in the absence of discovery what the Board's policy with regard to the voluntary nature of the survey had actually been. In the specific context of qualified immunity and the alleged constitutional claims, this Court reasoned:

> If a jury would find that the students were actually required to take the survey, then the District Court would have to address the further question in the qualified immunity analysis as to whether a teacher or principal in this setting would have reasonably understood that the survey was being administered in violation of the law.
>
> ...
>
> We are not ... prepared to say that [plaintiffs] could not, as a matter of law, establish any set of facts which would demonstrate violations of the other constitutional rights asserted. We believe that a conclusion as to the contours of these guarantees is specific to the factual setting and should be reached after discovery.

The parties then engaged in discovery, after which the School Defendants again moved for summary judgment on the constitutional

26

claims remaining in the case.[16]  The District Court (Linares, J.) granted the motion in full upon concluding that Plaintiffs had failed to identify any constitutional violations, and further that, even if they had, the individual School Defendants would be entitled to qualified immunity.  319 F. Supp. 2d 483.  Critically, the District Court determined that the summary judgment record supported only a finding that the survey had been voluntary and anonymous.  *Id.* at

---

[16]Meanwhile the United States Department of Education issued its final decision in the seven administrative complaints. *See supra* n.14.  In a letter decision dated December 18, 1999, the Family Policy Compliance Office of the Department of Education noted that during the course of its investigation, the Board had taken the position that it did not "require" the survey and thus the PPRA's parental consent provision was not triggered.  *See* 20 U.S.C. § 1232h(b) ("No student shall be *required*, as part of any applicable program, to submit to a survey ... that reveals information concerning – [listing types of information] without the prior consent" of the student or parent where the student is an unemancipated minor) (emphasis added).  The Compliance Office, however, found that the District had violated the PPRA because "[a]pplying the totality of the circumstances test to the evidence before this Office [which evidence included declarations and affidavits which had been borrowed from this civil action in its pre-discovery stage], ... the District 'required' students to take the survey."  A. 626.  As a result, the Compliance Office ordered the Board to provide it with "written assurance that all appropriate officials of the District have been informed of the PPRA requirements.  Specifically, [that they were] informed of the requirement that written consent be obtained from parents prior to administering a survey that is subject to PPRA."  *Id.* at 627.

27

491.[17]  This, in turn, impacted the court's reasoning as to the existence of any constitutional violations.  The District Court also explained, however, why, even assuming the survey had been involuntary, no constitutional violations had occurred.  Finally, although unnecessary, the District Court also opined that the individual School Defendants would have qualified immunity because "reasonable school officials would not have known that the administration of a voluntary, confidential and anonymous survey to students after providing adequate notice to parents to opt-out was unconstitutional."  *Id.* at 499.  Plaintiffs appealed.

II.

The District Court had jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343(3).  We have jurisdiction pursuant to 28 U.S.C. § 1291.

"We exercise plenary review over a district court's grant of summary judgment and apply the same standard as the district court; i.e., whether there are any genuine issues of material fact such that a reasonable jury could return a verdict for the plaintiffs.  We are required to review the record and draw inferences in a light most favorable to the non-moving party, yet the non-moving party must provide admissible evidence containing specific facts showing that there is a genuine issue for trial."  *Pa. Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 379 (3d Cir. 2005) (internal quotations and citations omitted).  "[S]ummary judgment may not be

---

[17]The District Court took note of the Department of Education's administrative finding that the District had "required" students to participate in the survey, but stressed its independent duty to examine the record in light of the specific constitutional violations alleged.  319 F. Supp. 2d 493 n.3.

28

granted, however, if there is a disagreement over what inferences can reasonably be drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368, 1380 (3d Cir. 1991).

## III.

Pursuant to 42 U.S.C. § 1983, Plaintiffs seek to hold both the Board and the individual School Defendants liable for constitutional violations. To impose liability on the Board under § 1983, Plaintiffs must show a "relevant [] policy or custom, and that the policy caused the constitutional violation ... allege[d]." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). *See also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."). To impose liability on the individual defendants, Plaintiffs must show that each one individually participated in the alleged constitutional violation or approved of it. *C.H. v. Olivia*, 226 F.3d 198, 201-02 (3d Cir. 2000) (en banc).

The individual defendants, however, may be entitled to qualified immunity if "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In assessing qualified immunity, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). *See also Sutton v. Rasheed*, 323

29

F.3d 236, 250 n.27 (3d Cir. 2003) (reasoning that, because the directive in *Wilson* is mandatory, a district court "can decide the issue of qualified immunity only after it has concluded that a cause of action has been stated," and therefore, courts of appeals initiates its inquiry by examining whether plaintiffs have alleged a constitutional violation).  Under this framework, the existence of a constitutional violation is the threshold inquiry.

IV.

In the course of analyzing the compelled speech claim, the District Court concluded that the evidence on summary judgment supported only a finding that the Board intended the survey to be voluntary.  *See* 319 F. Supp. 2d at 491 ("[E]ven construing all facts in the light most favorable to the non-movants, the record does not support Plaintiffs' contention that the students were compelled by Defendants to disclose any information.  All of the evidence obtained through discovery indicates that Defendants had fully intended the survey to be voluntary, made considerable efforts to make known the voluntary nature of the survey to the parents and teachers, and took reasonable actions to ensure that the survey was in fact administered in a fashion so that the students would understand it was voluntary.") (emphasis omitted); *see also id.* at 492 ("the Board's policy and practice was for student survey responses to be voluntary, anonymous and confidential.").  The District Court also concluded that, to the extent Plaintiffs sought to hold the Board liable under Section 1983 for failure to supervise any school administrator who might have made the survey mandatory, the record did not indicate that the School Defendants had contemporaneous knowledge of any subordinates' failure to follow instructions, or that the School Defendants had tacitly approved of any compulsion brought to bear on students by its subordinates.  *See id.* at 492. As to the individual School Defendants, the District Court concluded that the summary

30

judgment record "points to neither participation nor approval by [them] of any unconstitutional actions." *Id.*

On appeal, Plaintiffs contend that summary judgment was improperly granted to the School Defendants because there remains a dispute over what are, in this case, the two key facts – i.e., whether the survey was voluntary and whether it was anonymous. The governing legal framework outlined above requires that these two key facts be analyzed in two ways: First, we must ask whether the record could support a finding that the survey, as actually administered, was involuntary and non-anonymous. And if the record would support such a finding, we must then inquire whether the record would also support that the Board actually intended for the survey to be involuntary and non-anonymous, such that the Board might be liable under § 1983 for an unconstitutional policy or practice. On the existing record, we find a genuine issue of material fact as to whether the survey was voluntary, both as administered and as intended by the Board. At the same time, however, we find that the summary judgment record supports only one finding as to anonymity and that is that the survey, as administered and as intended by the Board, was anonymous. We explain both conclusions in Part V, sub-sections A & B. Then, in Part VI, we explain why, even assuming the survey was involuntary, no constitutional violations have been shown.

A.     Voluntariness

1.     Administration of the survey

A myriad of direct and indirect evidence coalesces to support the reasonable inference that the survey, as actually administered, was

31

involuntary.[18]  First and perhaps most critically, the direct evidence relevant to what occurred on survey day in the High School and the Benjamin Franklin Middle School – even with Senior Plaintiff's admission that her administrator instructed students that the survey was voluntary – supports an inference of involuntariness in administration.  Relevant to events at the Middle School, Middle School Plaintiff testified that students in her homeroom where she took the survey were told by teacher Mr. Grasso that "you have to take [the survey]."  Mr. Grasso admitted he may not have told his class the survey was voluntary, and could not recall his superiors giving him instruction as to actual administration.  At the High School, both Freshman and Senior Plaintiffs testified that they heard a loud speaker announcement that they interpreted to warn that anyone not taking the survey would receive "a cut."  The instructions read at the High School did not inform students that the survey was voluntary, stressed that students were to answer questions "seriously" and "honestly" and asked students to "please begin."  These instructions echo what students might hear before mandatory state testing.  And, despite being present during the actual administration, Defendant High School Principal Mucciolo did not intercede to add to the spoken instructions that the survey was voluntary.

Second, a form returned to Search Institute with the completed surveys under the auspices of Dr. Verdicchio indicated that 100% of students in grades 7-12 participated in the survey.  In a district as large as Ridgewood, such a high compliance level alone lends considerable support to a finding of involuntariness in administration.  Such a finding is further bolstered here by evidence that another student (not a plaintiff) who was absent on survey day from the George Washington Middle School was required "to make it up" on

[18]We stress that by "involuntary," we mean only that students were required to participate in the survey.

32

the day he returned. Overall, the record suggests that school officials attempted to ensure the fullest participation possible. It would be permissible to infer therefrom that the survey was administered as involuntary.

Third, while the record reveals numerous efforts made by the district and community organizations to notify parents of the survey and encourage them to review it in advance, the evidence also shows that no consent form was distributed to parents nor were parents ever instructed how to avoid their child's participation if a parent objected to the survey. We are not in the business of second-guessing public school decision-making, and thus we offer no comment on the legality or wisdom of this approach. Nonetheless, we believe that a jury could view such as supporting an inference of involuntariness in actual administration. On a related note, the evidence also shows the absence of any advance warning of the exact dates on which the survey would be administered. *See* A. 642 (Superintendent Stokley's May 19 letter, providing "The [HHRC] and a coalition of twenty Ridgewood organizations are making plans to survey our village youth, ages 12-19, in September [1999]."); A. 637 (Superintendent Stokley's September 1 letter, providing "[i]n late September [1999], Village youth will be asked to complete a survey ... The voluntary and anonymous survey will be made available to young people in grades 7-12."). A jury could legitimately wonder how a parent who objected to the survey could seek to avoid it for their child. On what day would the parent keep the child home from school or instruct her to hand in a blank survey? A jury could reasonably think it unrealistic in this age of busy, working parents and busy, scheduled children that a letter warning of a survey on a date uncertain would be sufficient to allow a parent to act on an objection. For this reason, we reject the District Court's finding that parents were given an opt-out option in this situation.

33

Fourth, the survey was administered in a setting that may have suggested to some students that participation was mandatory. Completion of the survey was estimated to take an entire class period, and all students were required to remain in the room and at their desks during this period. In short, the procedure was very much like the procedure that is customarily followed when a test is administered, and this similarity may well have suggested to students that the survey, like a test, had to be completed and handed in.

Overall, we conclude that because the record would permit an inference of involuntariness in administration, the District Court overstepped its role in concluding that the survey was voluntary.

2.    Board policy

The harder question in this case is whether the record could also support a finding that the Board and certain individual School Defendants intended for the survey to be involuntary in administration – in other words, whether it was Board policy to administer the survey as involuntary. Such a finding is necessary to hold the Board liable under § 1983, and to ensure that this case is not merely one of subordinates defying instruction. *See Natale*, 318 F.3d at 583 (state agency cannot be held liable under § 1983 for the acts of its employees under a theory of respondeat superior or vicarious liability).

As the District Court identified, there is certainly much evidence in the record to support that the Board intended the survey to be voluntary. *See* 319 F. Supp. 2d at 491-92. However, our review has convinced us that much of the same evidence outlined above could also reasonably lead a jury to infer that the Board intended the survey to be involuntary. One might infer, especially in light of the close ties between certain School Defendants and the HRCC and/or

34

Community Vision Team, that the School Defendants took advantage of the compulsory nature of the school setting to ensure a high level of participation in the survey which they supported as a method of information gathering. One might also infer that parental consent was not solicited and Superintendent Stokley's letter purposefully left out the exact date of administration in an effort to ensure the fullest participation. Additionally, one might examine the events leading up to administration at the two school buildings and conclude that administrators purposefully provided inadequate direction to administrators or failed to correct misinformation in an attempt to promote participation. While we tend to think that the stronger inference on this record is simply one of lack of attention to some key details as opposed to intent, we cannot rule out that a jury might examine the evidence and reasonably indulge an inference of intent.[19] Thus, we conclude that the summary judgment record would also support a finding that the survey as intended by the Board and certain School Defendants acting on behalf of the Board was involuntary. The District Court erred in holding to the contrary.

B.    Anonymity

On the other hand, we conclude that Plaintiffs have failed to identify a genuine issue of material fact as to anonymity. While the District Court did not separately treat the evidence as to anonymity,

[19]Even if a jury would find that the Board and certain School Defendants intended the survey to be involuntary, the record reflects that such was pursued only in the spirit of ensuring the highest level of participation possible in order to generate more useful information for laudable community purposes. The record does not reflect that the School Defendants sought to influence students' actual answers on the survey. This is an important distinction upon which we draw in rejecting Plaintiffs' constitutional claims. *See infra* Part V.

it clearly viewed the record as supporting only a finding that the survey as actually administered and as intended by the Board was anonymous. *See* 319 F. Supp. 2d at 492 ("For the reasons already stated, the Board's policy and practice was for student survey responses to be ... anonymous"); *id.* at 494 ("The information ... was obtained anonymously, in confidence and the individual results were not publicly disseminated").

On appeal, Plaintiffs point to the following evidence as creating a genuine issue of material fact on anonymity: Middle School Plaintiff testified that her survey booklet had affixed to it a sticker seeking identifying information and one student had a teacher look over his shoulder, observe his responses and make him retake the survey in a one-on-one setting, and at least one student who missed the survey was identified and made to take it in a one-on-one or small setting. We deem this evidence insufficient as a matter of law to support a factual finding in Plaintiffs' favor. Only Middle School Plaintiff recalled the sticker. Against this evidence, Mr. Grasso explained why such stickers would not have been used and every other School Defendant stressed that anonymity was maintained. Additionally, while a few students (notably not the Student Plaintiffs, and out of over 2000 students who took the survey district-wide) were placed in settings with a potential to compromise anonymity, there is no evidence that anonymity was actually compromised. Instead, the record reflects that the surveys were treated as anonymous during the actual administration and afterwards.[20] Additionally, we do not believe the record would

---

[20]This might be a different case if Plaintiff students actually observed administrators peeking at completed surveys or if the survey setting itself lent support to Plaintiffs' fears of compromised anonymity. This record, however, with a few isolated exceptions, shows that the survey was administered in large classroom settings;

support an inference that the Board intended the survey to be non-anonymous.  The record shows that anonymity and confidentiality – as opposed to voluntariness – were consistently stressed to parents, principals and survey administrators.

V.

The existence of a disputed issue of material fact as to voluntariness, however, does not preclude summary judgment for the School Defendants in this case.  Even if we assume, as the District Court did, that the survey was purposefully administered as involuntary, no violation of the right to privacy or the First Amendment right against compelled speech has been shown.

Before we address the constitutional claims, we deem it appropriate to dispose of the primary argument for affirmance advanced by the School Defendants (and supported by The National School Boards Association and the New Jersey School Boards Association as *amici*):  that because Ridgewood, as a New Jersey school district, is mandated to teach students about many of the sensitive topics included on the survey, no constitutional violation can be shown.[21]  We reject this argument.  The scope of the right to

_____

it simply strains credulity to think that an administrator could first, identify a particular student's booklet and second, sneak a peek at it before completed surveys were collected en masse and delivered to the district's main office.  The record simply does not substantiate the Plaintiffs' suspicions.

[21]*See* New Jersey Dept. of Education, *New Jersey Core Curriculum Content Standards for Comprehensive Health and Physical Education* (May 1996) (available at http://www.state.nj.us/njded/cccs/archive/1996) ("all students will

37

privacy is defined by the Constitution and may not be restricted by a state legislature or by state education officials. School-sponsored speech may be restricted for legitimate pedagogical purposes, *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988), and it seems clear that a school may compel some speech for such purposes. For example, a school may compel a student to write a paper on a particular topic even if the student would prefer to write on a different topic. How far a school may go in compelling speech for what it views as legitimate pedagogical purposes is a difficult and unsettled question. We need not explore that question here, however, because the survey administered at Ridgewood was not chosen by New Jersey as a means of advancing education, but by a group of local organizations and district officials who deemed it convenient to use the local school district as the venue for administration. The record reflects that the survey was not administered in the letter or spirit of fulfilling New Jersey's educational requirements, but rather as a means to collect information to enable laudatory social programs.

A.     Right to Privacy

The United States Constitution does not mention an explicit right to privacy and the United States Supreme Court has never proclaimed that such a generalized right exists. The Supreme Court has, however, found certain "zones of privacy" in the amendments to the Constitution, *see Roe v. Wade*, 410 U.S. 113, 152-153 (1973)

---

learn the physical, mental, emotional, and social effects of the use and abuse of alcohol, tobacco, and other drugs" and "the biological, social, cultural, and psychological aspects of human sexuality and family life."); School Defendants' Br. 14-15 ("Plainly, the public policy of the State of New Jersey is that responsible discourse concerning these subjects is no longer the exclusive province of the home, but is now a critical element of a public school education").

38

(tracing this development), and from these zones has specified that the constitutional right to privacy "protects two types of privacy interests: 'One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'" *Hedges v. Musco*, 204 F.3d 109, 121 (3d Cir. 2000) (quoting *Whalen v. Roe*, 429 U.S. 589, 599-600 (1977) (footnote omitted)). *See also Sterling v. Borough of Minersville*, 232 F.3d 190, 193-196 (3d Cir. 2000) (tracing the development and treatment of the right to privacy in Supreme Court and Third Circuit jurisprudence).[22] The "important decisions" referred to in the latter strand of the privacy protection "have encompassed 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education.'" *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) (quoting *Paul v. Davis*, 424 U.S. 693, 713 (1976)). Plaintiffs alleged violations of both types of privacy interests in this case; we address each in turn.

1.      Disclosure of personal matters

"[T]he right not to have intimate facts concerning one's life disclosed without one's consent" is "a venerable [right] whose constitutional significance we have recognized in the past." *Bartnicki*

---

[22]Plaintiffs asserted constitutional violations based on Plaintiffs' right under the Fourth and Fourteenth Amendments to be free from unlawful intrusion into the household, Plaintiff Parents' substantive due process right under the Fourth and Fourteenth Amendments to raise their children as they see fit and Plaintiffs' right under the Fourth and Fourteenth Amendments to privacy. Although denoted as three separate constitutional claims, we, like the District Court, interpret these claims to invoke the two recognized strands of the privacy right, and will analyze them accordingly.

*v. Vopper*, 200 F.3d 109, 122 (3d Cir. 1999) (citing *Paul P. v. Verniero*, 170 F.3d 396 (3d Cir. 1999) (collecting cases)). "In determining whether information is entitled to privacy protection, [this Court] ha[s] looked at whether it is within an individual's reasonable expectations of confidentiality. The more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Fraternal Order of Police v. City of Philadelphia*, 812 F.2d 105, 112 (3d Cir. 1987). As we explained in *Sterling*, "[o]ur jurisprudence takes an encompassing view of [the] information entitled to a protected right to privacy." 232 F.3d at 195. Thus, we have deemed to be protected a private employee's medical information when sought by the government, *Westinghouse Elec.*, 638 F.2d 570, medical, financial and behavioral information relevant to a police investigator's ability to work in dangerous and stressful situations, *Fraternal Order of Police*, 812 F.2d 105, a public employee's medical prescription record, *Doe v. Southeastern Pennsylvania Trans. Auth.* (*SEPTA*), 72 F.3d 1133 (3d Cir. 1995), a minor student's pregnancy status, *Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000), sexual orientation, *Sterling*, 232 F.3d 190, and an inmate's HIV-positive status, *Doe v. Delie*, 257 F.3d 309 (3d Cir. 2001). The constitutional right to privacy extends to minors. *See Application of Gault*, 387 U.S. 1, 13 (1967) ("neither the Fourteenth Amendment nor the Bill of Rights is for adults alone"); *Gruenke*, 225 F.3d 290 (reversing summary judgment and remanding for consideration of minor student's disclosure-based privacy claim).

The right to avoid disclosure of personal matters is not absolute, however. "Public health or like public concerns may justify access to information an individual may desire to remain confidential." *Sterling*, 232 F.3d at 195 (citing *Westinghouse Elec.*, 638 F.2d at 577); *see also Fraternal Order of Police*, 812 F.2d at 110 ("Disclosure may be required if the government interest in disclosure outweighs the individual's privacy interest"). As we explained in

40

*Westinghouse Electric*, in order to decide whether an intrusion into an individual's privacy is justified, "we must engage in the delicate task of weighing competing interests." 638 F.2d at 578. The following factors should be considered: "the type of record requested, the information it does or might contain, the potential for harm in any subsequent nonconsensual disclosure, the injury from disclosure to the relationship in which the record was generated, the adequacy of safeguards to prevent unauthorized disclosure, the degree of need for access, and whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access." *Id.*

In this case, the District Court found that the information requested, as it related to sexual activity, drug and alcohol use and relationships, was "of course [ ] intimate and private." 319 F. Supp. at 495. We agree. The District Court, however, then rejected that a constitutional violation had been shown because it found unmet what it considered to be two threshold requirements to an actionable disclosure claim – i.e., (1) actual disclosure of a kind that would permit identification between the individual and the personal information, and (2) disclosure that was involuntary in nature. *See id.* at 494-495. Additionally, the District Court reasoned that, even were it to ignore such threshold requirements, the claim would still fail under the balancing test of *Westinghouse Electric*. *See id.* at 495. Because we recognize the existence of a genuine issue of material fact on voluntariness, we will not affirm the District Court's rejection of the disclosure-based privacy claim on the ground that disclosure was

41

voluntary.[23]   However, we agree that the claim fails under the balancing test.

The cases in which a disclosure-based privacy violation has been found involve situations where there was either actual identification or the disclosure of identifying information such as would allow the individual to be identified and ultimately connected to his or her private information.  In *Whalen*, for example, the challenged statutory scheme required the disclosure of a patient's name, address and age, as well as the drug prescribed, to state health officials.  429 U.S. at 593.  Similarly, in *Fraternal Order of Police*, job applicants challenged certain intimate questions appearing on a employment questionnaire which required the applicant to identify himself by name.[24]

---

[23]As we will explain in our discussion of the First Amendment compelled speech claim, the question of whether disclosure of information by the students was voluntary is a nuanced one on these facts.  Even if the students were required to take the survey, the record reveals that they were not required to answer every question, and could choose their answers from within the confines of the answers provided.  Thus, in a sense, we agree with the District Court that any private information disclosed was not necessarily disclosed involuntarily.

[24]In the discovery context, lower courts recognize that the constitutional interest in avoiding disclosure of private information is satisfied once identifying information is removed.  *See, e.g.*, *Wei v. Bodner*, 127 F.R.D. 91, 98 (D.N.J. 1989) (stating, in context of Sherman Act suit brought by anesthesiologist against other physicians and hospital, that "the constitutional right of privacy weighs in favor of removing patient's names from all documents.  ...  It is the combination of the personal information with identifying information

42

*Doe v. SEPTA*, in which this Court addressed as a threshold matter the existence of disclosure as a prerequisite to the assertion of a disclosure-based privacy claim, is also instructive. SEPTA provided a self-insured health care program and the official responsible for containing program costs requested prescription utilization reports from Rite-Aid, the program's sole prescription provider. The report listed by name those employees filling prescriptions at a cost of $100 or more per month, along with the drugs supplied. The official deduced therefrom that Plaintiff Doe was HIV positive and shared this information with another official then aiding the cost-containment efforts. In this context, we explained:

> we must first assess whether, and to what extent, [the official] disclosed [plaintiff's] prescription drug information. Obviously, no privacy violation would have taken place had the information from Rite-Aid come in encoded form. ... *Doe would have no cause of action if all that had been disclosed were that an unknown number of people at SEPTA were purchasing Retrovir for the treatment of HIV-related illnesses*. Therefore, such disclosure as occurred came only when Doe's name was revealed with respect to his purchase of drugs under SEPTA's prescription drug program.

72 F.3d at 1138 (emphasis added). In *Doe*, we went on to determine that the Employer's need for access outweighed the Employee's interest in confidentiality.

---

to which people object. Once the identifying information is redacted, the majority of the privacy concerns are eliminated") (citation omitted)).

43

We conclude that Plaintiffs' disclosure-based privacy claim fails under the balancing test. As the District Court correctly noted, the first five factors of the test (i.e., the type of record requested, the information it does or might contain, the potential for harm in any subsequent non-consensual disclosure, and the injury from disclosure to the relationship in which the record was generated) account for the individual's privacy expectation while the final two factors account for the governmental interest in disclosure. We adopt the District Court's assessment of the first five factors, and thus find that while the privacy expectation is great, the privacy side of the balance is nonetheless lessened because disclosure of personal information occurred only in the aggregate and personal information was adequately safeguarded. *See* 319 F. Supp. 2d at 495-96. As we explained above, the record shows that the survey was administered as anonymous. The survey did not ask students to identify themselves by name or address. While the survey did seek some statistical information that could conceivably be used to trace a student's identity, the record reflects confidentiality in the administration, collection and storage of the surveys prior to submission to Search Institute for tabulation of results.[25] Once tabulated, the surveys were destroyed. The information, moreover, while publicly disclosed, was revealed only in the aggregate, in a format that did not permit individual identification.

_____

[25]We are not saying that identification based on such statistical information could never occur. Certainly there may be instances where an individual is readily identifiable by such data; a single school building, for example, might contain only one African American or Native American student or one family headed by a single parent, or one family in a particularly high or low socio-economic category. Such is not the case here, however.

44

We part company slightly with the District Court, however, in its assessment of the governmental interest. While New Jersey's public school districts must educate students about some of the sensitive topics appearing on the survey, administration of the survey at Ridgewood was undertaken to gather information. We do not understand New Jersey to have explicitly sanctioned this kind of social research being undertaken in its schools, and thus we hesitate to engage in an analysis under the balancing test that might condone an individual district for having done so. At the same time, the record reflects that the survey was administered at Ridgewood in an attempt to obtain information directly related to the understanding and prevention of the social problems confronting today's youth – a laudable goal, apparently pursued with the youths' best interests in mind. In this unique context, we will deem the balance to tip in the government's favor, and accordingly find no constitutional violation of the privacy right against disclosure.

### 2. Independence in important decision-making

"[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). *See also McCurdy v. Dodd*, 352 F.3d 820, 826-27 (3d Cir. 2003) (examining the nature and history of the right); *Gruenke*, 225 F.3d at 303, 304 (acknowledging that "[t]he right of parents to raise their children without undue state interference is well established" and that in *Troxel*, the Supreme Court had "reaffirmed the validity of such long-standing precedents as *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (right of parents to control education of their children), *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925) (right to direct upbringing and education of children), and *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944), where the [Supreme] Court said 'the

45

custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.'") (parallel citations removed)); *Parents United for Better Schools, Inc. v. Sch. Dist. of Philadelphia Bd. of Educ.*, 148 F.3d 260 (3d Cir. 1998) (recognizing the right).

The Supreme Court has never been called upon to define the precise boundaries of a parent's right to control a child's upbringing and education. It is clear, however, that the right is neither absolute nor unqualified. *See Lehr v. Robertson*, 463 U.S. 248, 256 (1983) (constitutional protection available for parent-child relationship in "appropriate cases"); *Croft v. Westmoreland Co. Children and Youth Serv.*, 103 F.3d 1123, 1125 (3d Cir. 1997) (interest of parents in the care, custody and management of children is "not absolute"; "liberty interest in familial integrity is limited by the compelling governmental interest in the protection of children"); *Hodge v. Jones*, 31 F.3d 157, 163-64 (4th Cir. 1994) ("The maxim of familial privacy is neither absolute nor unqualified, and may be outweighed by a legitimate governmental interest."). In *Gruenke*, this Court recognized that, despite the Supreme Court's "near-absolutist pronouncements" concerning the right to familial privacy, the right is necessarily qualified in a school setting where "the state's power is 'custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults.'" 225 F.3d at 304 (quoting *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655 (1995)). Courts have held that in certain circumstances the parental right to control the upbringing of a child must give way to a school's ability to control curriculum and the school environment. *See, e.g.*, *Swanson v. Guthrie Independent Sch. Dist.*, 135 F.3d 694 (10th Cir. 1998) (school policy against part-time attendance did not violate parent's right to direct upbringing of child); *Herdon v. Chapel Hill-Carrboro City Bd. of Educ.*, 89 F.3d 174 (mandatory student participation in community service program did not violate parents' right to direct the

46

upbringing of their child); *Immediato v. Rye Neck Sch. Dist.*, 73 F.3d 454 (2d Cir. 1996) (same); *Brown v. Hot, Sexy and Safer Prods., Inc.*, 68 F.3d 525, 533 (1st Cir. 1995) (finding in context of plaintiff parents' claim that mandatory student attendance at sexually explicit AIDS awareness assembly that plaintiff parents had failed to demonstrate an intrusion of constitutional magnitude" on the right to direct the upbringing and control of child). This case, however, like *Gruenke*, involves a situation where the challenged action of the school defendant is not neatly tied to considerations of curriculum or educational environment. In *Gruenke*, this Court concluded that the parents of a public school student forced to take a commercial pregnancy test by her high school swim coach who later discussed the positive result with others (but notably not the student's parents), had stated a claim for violation of the familial right to privacy. As the *Gruenke* panel explained:

> Although a student may not enjoy a right of privacy to the same extent as a free adult, there are nevertheless limitations on intrusions by school authorities.
>
> ...
>
> School-sponsored counseling and psychological testing that pry into private family activities can overstep the boundaries of school authority and impermissibly usurp the fundamental rights of parents to bring up their children, as they are guaranteed by the Constitution. Public schools must not forget that '*in loco parentis*' does not mean 'displace parents.'
>
> It is not educators, but parents who have primary rights in the upbringing of children. School officials have only a secondary responsibility and must respect

47

these rights. State deference to parental control over children is underscored by the [Supreme] Court's admonitions that the child is not the mere creature of the State, and that it is the parents' responsibility to inculcate moral standards, religious beliefs, and elements of good citizenship.

225 F.3d at 304, 307 (internal citations and quotations omitted).

In this case, the District Court concluded that no violation of the familial right to privacy had been shown. Its reasoning was two-fold. First, the District Court reemphasized that the existing record supported only a finding that the survey had been voluntary and anonymous, or at least that the Board had so intended. 319 F. Supp. 2d at 498. In this regard, the District Court relied heavily upon its own interpretation of Defendant Superintendent Stokley's September 1999 letter to parents, suggesting that "[t]he most logical inference to be drawn from this correspondence is that the child would be surveyed if the parent did not respond. In addition to the correspondence, the survey was preceded by months of publicity through [PTA] Association meetings and discussions in school and the community. Any parent who did not want his or her child to take the survey could have simply told the child not to answer the questions, without any adverse repercussions." *Id.* This characterization of the facts allowed the District Court to then analogize the familial privacy claim asserted here to that rejected by this Court in *Parents United for Better Schools*, 148 F.3d at 274-75 (rejecting familial right to privacy claim in the context of a voluntary high school condom distribution program accompanied by a parental opt-out provision). *See id.* Second, the District Court distinguished *Gruenke*, reasoning that the facts in this case could not be fairly compared to those which gave rise to the claim in *Gruenke*. Because we recognize a genuine issue of material fact over voluntariness, we

48

do not base our rejection of the familial right to privacy claim on a characterization of the record that assumes voluntariness, nor will we analogize this case to *Parents United for Better Schools*, which involved a parental opt-out provision. Rather, we conclude that even if the survey was involuntary, the conduct at issue does not rise to the level of a constitutional violation.

*Gruenke* is instructive. In that case, plaintiff parents asserted that the swim coach's action deprived them of their right to make decisions concerning their child, not simply that his action complicated the making and implementation of those decisions. As the *Gruenke* Court summarized:

> As the [plaintiff] parents explained, had not all the adverse publicity occurred as the result of [the swim coach's] actions, they would have quietly withdrawn [minor pregnant child] from school, apparently after the state [swim] meet, and sent her to Florida to live with her married sister. After the child was born, it might have been adopted by the sister or another sibling, but because [the swim coach's] conduct made the family's dilemma a topic of conversation for the school community, any discreet measures that the parents would have taken were no longer feasible. ... Mrs. Gruenke's position is that the management of this teenage pregnancy was a family crisis in which the State, through [the swim coach], had no right to obstruct the parental right to choose the proper method of resolution.

*See Gruenke*, 225 F.3d at 306. *See also id.* ("This case presents another example of the arrogation of the parental role by a school"); 309-10 (Roth, J., concurring) (agreeing with the ultimate finding of

49

qualified immunity for the defendant swim coach, but disagreeing with the other two panel members that the parents had stated a claim because, in her view, defendant swim coach's behavior "merely complicated the Gruenke's ability to make decisions concerning the pregnancy" and "the Gruenkes were free at all times to make whatever decision they pleased as to the outcome of [student's] pregnancy, even after [defendant swim coach] discussed her condition with other parents or swim team members"). We read *Gruenke* to recognize a distinction between actions that strike at the heart of parental decision-making authority on matters of the greatest importance and other actions that, although perhaps unwise and offensive, are not of constitutional dimension. Other Courts of Appeals have recognized a similar distinction. *See Hodge*, 31 F.3d at 163 ("[C]ircuit courts have strictly construed actionable violations of the familial privacy right to encompass only those instances where state official's actions were directly aimed at the parent-child relationship, *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. [(1991) (no familial privacy claim stated where police threatened children would never see arrested family member again and refused to let them kiss him goodbye)], implicated the 'most essential and basic aspect of familial privacy – the right of the family to remain together without the coercive interference of the awesome power of the state,' *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977) [(liberty interest in family privacy deprived without due process where children not returned to mother)], 'drove a wedge into a family and threatened its very foundation,' or 'eroded the family's solidarity internally and impaired the family's ability to function,' *Bohn* [*v. County of Dakota*], 772 F.2d [1433], at 1436 n.4 [(8th Cir. 1985) (father accused by county of child abuse)]); *see also Pittsley*, 927 F.2d at 8 ("State action that affects the parental relationship only incidentally ... is not sufficient to establish a violation").

In this case, Plaintiff Parents complain that the School Defendants, by not requiring parental consent prior to the administration of the survey and failing to provide sufficient information to allow an objecting parent to avoid having their child participate, deprived them of their right to make the important decision whether to allow their child to participate in the survey. Additionally, we understand Plaintiff Parents to complain that the School Defendants' actions intruded upon their parental authority to decide when and how to introduce their children to sensitive topics such as appeared on the survey.

The legitimacy and strength of the parental interest at stake has been recognized by the New Jersey legislature, which enacted the state's "Protection of Pupil Rights" law. *See* N.J.S.A. § 18A:36-43. This law, which took effect on January 1, 2001, requires "prior written informed consent" before a survey such as the one implicated here could be administered in New Jersey's public schools. By all accounts, the events at Ridgewood were the impetus for this new law. *See* Cheryl Wetzstein, "Consent required for nosy surveys; Parental outcry spurred N.J. law," WASH. TIMES, A5 (Jan. 14, 2002) ("The law stems from an outcry in Ridgewood, N.J., over a 1999 school survey ..."); Catherine Gewertz, "N.J. requires permission for student surveys," 21 EDUC. WK. 15 (Jan. 23, 2002) (same).

It does not necessarily follow, however, that the survey violated the Constitution. While the Supreme Court has extended constitutional protection to parental decisions regarding certain matters (see *Troxel*, 530 U.S. 57 (visitation); *Pierce*, 268 U.S. 510 (decision to enroll child in private, religious school rather than public school)), our review of these cases prompts us to conclude that the decision whether to permit a middle or high school student to participate in a survey of this type is not a matter of comparable gravity.

51

Further, while it is true that parents, not schools, have the primary responsibility "to inculcate moral standards, religious beliefs, and elements of good citizenship," *Gruenke*, 225 F.3d at 307, a myriad of influences surround middle and high school students everyday, many of which are beyond the strict control of the parent or even abhorrent to the parent. We recognize that introducing a child to sensitive topics before a parent might have done so herself can complicate and even undermine parental authority, but conclude that the survey in this case did not intrude on parental decision-making authority in the same sense as occurred in *Gruenke*. A parent whose middle or high school age child is exposed to sensitive topics or information in a survey remains free to discuss these matters and to place them in the family's moral or religious context, or to supplement the information with more appropriate materials. School Defendants in no way indoctrinated the students in any particular outlook on these sensitive topics; at most, they may have introduced a few topics unknown to certain individuals. We thus conclude that the survey's interference with parental decision-making authority did not amount to a constitutional violation.[26]

---

[26]In reaching this conclusion, we do not hold, as did the panel in *Fields v. Palmdale School District*, No. 03-56499, 2005 WL 2861946 (9th Cir. Nov. 2, 2005), that the right of parents under the *Meyer-Pierce* rubric "does not extend beyond the threshold of the school door." *Id.* at *65. Nor do we endorse the categorical approach to this right taken by the *Fields* court, wherein it appears that a claim grounded in *Meyers-Pierce* will now trigger only an inquiry into whether or not the parent chose to send their child to public school and if so, then the claim will fail. Instead, guided by *Gruenke*, wherein this Court stressed that it is primarily the parents' right "to inculcate moral standards, religious beliefs and elements of good citizenship," 225 F.3d at 307, we have determined only that, on the facts presented, the parental decisions alleged to have been usurped

52

B.      Compelled Speech

Plaintiffs contend that the School Defendants compelled the Plaintiff Students to speak about their associations and views on political concepts in violation of the First Amendment.  The District Court rejected the compelled speech claim on two different grounds. First, having concluded that the record supported only a finding of voluntariness, the District Court reasoned that the threshold requirement of compulsion was unmet.  319 F. Supp. 2d at 492-93. Second, the District Court reasoned that, even assuming involuntariness, the First Amendment right to refrain from speaking has no force where one is compelled to speak but need not embrace a particular viewpoint or message favored by the government. *See id.* at 493.  We will affirm the District Court's conclusion that no violation of the right against compelled speech occurred, but under slightly different reasoning.

1.

In *Turner Broadcasting System, Inc. v. Federal Communications Commission*, the Supreme Court explained that "[a]t the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.  Our political system and cultural life rest upon this ideal."  512 U.S. 622, 641 (1994). *See also Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *Board of Education v. Barnette*, 319 U.S. 624, 633-34 (1943)) ("the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all.  ...  The right to speak and the right to refrain

by the School Defendants are not of comparable gravity to those protected under existing Supreme Court precedent.

53

from speaking are complementary components of the broader concept of 'individual freedom of mind.'"); *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 796-97 (1988) ("the First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say") (emphasis in the original); *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) ("one important manifestation of the principle of free speech is that one who chooses to speak may also decide 'what not to say.'").

Before exploring the contours of the First Amendment's protection of the right "to refrain from speaking at all," it must be recognized that this particular right is necessarily different in the public school setting. While axiomatic that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969), the First Amendment's wide freedom in matters of adult public discourse has never meant that the First Amendment rights of students in the public schools are automatically coextensive with the rights of adults in other settings. *The Circle School v. Pappert*, 381 F.3d 172, 177-78 (3d Cir. 2004) (citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986)). "[S]tudents retain the protections of the First Amendment, but the shape of these rights in the public school setting may not always mirror the contours of constitutional protections afforded in other contexts." *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 253 (3d Cir. 2002). *See also Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (First Amendment rights of public school students must be applied in light of the special characteristics of the school environment). Thus, First Amendment jurisprudence recognizes that the educational process itself may sometimes require a state actor to force a student to speak when the student would rather refrain. A student may also be forced to speak

54

or write on a particular topic even though the student might prefer a different topic. And while a public educational institution may not demand that a student profess beliefs or views with which the student does not agree, a school may in some circumstances require a student to state the arguments that could be made in support of such beliefs or views. *See Brown v. Li*, 308 F.3d 939, 953 (9th Cir. 2002) (explaining in the context of First Amendment challenge to a university's refusal to approve a student thesis that "a college history teacher may demand a paper defending Prohibition, and a law-school professor may assign students to write 'opinions' showing how Justices Ginsburg and Scalia would analyze a particular Fourth Amendment question.... Such requirements are part of the teachers' curricular mission to encourage critical thinking ... and to conform to professional norms"); *see also Board of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 242-43 (2000) (Souter, J., concurring) (noting that university students "are inevitably required to support the expression of personally offensive viewpoints in ways that cannot be thought constitutionally objectionable unless one is prepared to deny the University its choice over what to teach."); *Marinello v. Bushby*, 1996 WL 671410 *14 (N.D. Miss. 1996) (unpublished) ("it is part of the function of schools to compel speech from students to some degree so that officials can ensure that the students are in fact learning what is taught"), *aff'd* 163 F.3d 1356 (5th Cir. 1998) (table); Smolla & Nimmer, FREEDOM OF SPEECH § 17:1.50 (2005) (compelling speech may be part of a school's curricular mission.).

It is settled law that "[g]overnment action that ... requires the utterance of a particular message favored by the Government, contravenes th[e] essential right" to refrain from speaking protected by the First Amendment. *Turner Broadcasting*, 512 U.S. at 641. *See also Barnette*, 319 U.S. 624 (affirming the issuance of an injunction against compulsory flag salute by public school students); *Wooley*,

430 U.S. 705 (affirming the issuance of an injunction against the enforcement of New Hampshire's statute criminalizing the act of obscuring the language on the state's "Live Free or Die" license plates); *Forum for Academic and Institutional Rights v. Rumsfeld*, 390 F.3d 219, 235-36 (3d Cir. 2004) (summarizing the existing jurisprudence), *cert. granted*, 125 S. Ct. 1977 (May 2, 2005). This principle recognizes that government action "of this sort pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion." *Turner Broadcasting*, 512 U.S. at 641. Thus, under First Amendment jurisprudence, "[l]aws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny [as applied to regulations that suppress, disadvantage, or impose differential burdens on speech because of its contents]." *Id.* at 642 (citing *Riley*; *Barnettte*).

The Supreme Court has only ever found a violation of the First Amendment right against compelled speech in the context of forced speech that requires the private speaker to embrace a particular government-favored message. Some lower court decisions may be read to suggest that the First Amendment right against compelled speech is violated only where the government mandates that the speaker express a certain viewpoint or message. *See, e.g.*, *Coleman v. Miller*, 117 F.3d 527, 531 (11th Cir. 1997) (rejecting compelled speech claim in context of challenge to constitutionality of the Georgia state flag because plaintiffs "pointed to no government action that requires affirmation of a belief and an attitude of mind") (internal citation omitted); *United States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) (rejecting compelled speech challenge to IRS summons because the summons required recipient "only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he

disagrees"); *see also id.* ("First Amendment protection against compelled speech ... has been found only in the context of governmental compulsion to disseminate a particular political or ideological message."). The District Court in this case so held, and rejected Plaintiffs' compelled speech claim on the grounds that the School Defendants did not force students to express any particular message in choosing answers on the survey. We find this interpretation of the right to be too limited. The Supreme Court in *Turner Broadcasting* recognized that government compulsion to speak may exist in the absence of content-based regulation, and instructed that such action be subject to an intermediate level of scrutiny. *See* 512 U.S. at 642. Thus, the law does not hold that a compelled speech violation occurs only in the context of compulsion to embrace a certain viewpoint; rather, it subjects compelled speech to different levels of scrutiny depending on whether the government is also compelling a certain viewpoint as part of the compelled speech.

While we reject the District Court's reasoning in this regard, we need not determine the exact contours of the "right to refrain from speaking" or the breadth of its protection to students in the public school setting because Plaintiffs do not ask us to determine whether merely requiring Plaintiff Students to participate in the survey violated this right. Rather, they present the much narrower question of whether requiring students to participate in a survey that sought information about their associations and opinions on political concepts violates the right against compelled speech. Framed in this manner, Plaintiffs' claim implicates the First Amendment and its protection for privacy concerns. As the Supreme Court stated in *Brown v. Socialist Workers '74 Campaign Committee*, "[t]he Constitution protects against the compelled disclosure of political associations and beliefs." 459 U.S. 87, 91 (1982). *See also Buckley v. Valeo*, 424 U.S. 1, 64 (1976) ("we have repeatedly found that

57

compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment"); *Shelton v. Tucker*, 364 U.S. 479, 485-86 (1960) ("to compel a teacher to disclose his every associational tie is to impair that teacher's right of free association, a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society"); *Fraternal Order of Police*, 812 F.2d at 119.

One other general principle of compelled speech jurisprudence informs our analysis, and that is that a violation of the First Amendment right against compelled speech occurs only in the context of actual compulsion. "In order to compel the exercise ... of speech, the governmental measure must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie County Community College Bd. of Trustees*, 235 F.3d 1243, 1244-47 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). Such compulsion, however, "need not take the form of a direct threat or a gun to the head." *Axson-Flynn*, 356 F.3d at 1290.

2.

In analyzing this First Amendment compelled speech claim, we will assume without deciding that the act of answering questions on a survey is speech for First Amendment purposes.[27] The claim nevertheless fails.

First, Plaintiffs have not shown the compulsion necessary to establish a First Amendment violation. Even assuming the School Defendants forced students to take the survey, there was no evidence

---

[27]We decline to address School Defendants' argument that there was no "speech" here for First Amendment purposes.

of "some type of disincentive or penalty if the survey was not completed," 319 F. Supp. 2d at 492, or if certain answers were or were not selected. The record supports only that students were made to sit in chairs and put pen to paper during administration of the survey. The record does not suggest that School Defendants threatened or actually punished students for failure to complete the survey or to select particular answers. There has been no suggestion that Ridgewood personnel had any interest in compelling certain answers as might reflect on the district or community efforts; rather, the School Defendants appear to have wanted merely to collect as much information as the survey could generate.

Second, the disclosure required for a constitutional violation of the First Amendment's protection against compelled disclosure of private information simply has not been shown. With regard to associations, students were not asked to list their group memberships or associations by name. Rather, Questions 60, 61, 62 and 64 asked them to identify how many hours in an average week they spent participating in "sports," "clubs or organizations (other than sports) at school" "clubs or organizations (other than sports) outside of school" and "going to programs, groups or services at a church, synagogue, mosque, or other religious or spiritual place." Question 130 asked how many evenings per week a student spent going "out to activities at a school, youth group, congregation or other organization." At most, one could possibly deduce from the answers that a student either had a religious affiliation of some kind or not. But the information was disclosed in a format that did not permit individualized detection. We can find no authority to suggest that merely requesting such highly generalized information or releasing it in the aggregate violates the Constitution.

Students were also asked questions which Plaintiffs characterize as inquiring into core political concepts like racial

59

equality, hunger, poverty, religion and charity. For example, some questions asked students how important certain concepts (including "helping to reduce hunger and poverty in the world," and "helping to make sure that all people are treated equally") were to them personally, to be rated on a scale from "not important" to "extremely important." Even assuming this information is entitled to some measure of privacy, we see no constitutional violation where the information is safeguarded and released only in the aggregate with no way to tie a student to his or her responses.

## VI.

We conclude that the summary judgment record in this case does give rise to a genuine issue of material fact over whether the survey as administered and as intended by the Board was voluntary. However, because even assuming that fact in the Plaintiffs' favor, no constitutional violation of the right to privacy or the First Amendment right against compelled speech has been shown, we will affirm the grant of summary judgment to the School Defendants.[28]

---

[28]In light of our disposition, we need not reach the issue of qualified immunity.